## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ | ) |
| **JEFFREY THOMAS, JR.** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil No. 18-cv-00800-TJK |
| | ) |
| **CRYSTAL MORELAND,** | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

### AMENDED COMPLAINT AND JURY DEMAND

This is an action by Plaintiff Jeffrey Thomas, Jr. ("Thomas"), through his undersigned counsel, Diane A. Seltzer Torre and the Seltzer Law Firm, against Defendant Crystal Moreland ("Moreland") to recover damages for defamation as a result of Defendant's actions.

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a).

2.      Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b), as all relevant actions alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Columbia.

### PARTIES

3.      Plaintiff Thomas is a resident of the District of Columbia.

4.      Defendant Moreland is a resident of California who was employed in and lived in the District of Columbia when the facts giving rise to this lawsuit transpired.

### FACTUAL ALLEGATIONS

5.      From February 13, 2017 through November 8, 2017, Thomas was employed by the Humane Society Legislative Fund (HSLF) in Washington, D.C. as a Policy Analyst.

6.      At all relevant times, Moreland was employed by the Humane Society of the United States (HSUS) primarily in Washington, D.C. as Special Assistant to then-Chief Executive Officer (CEO) Wayne Pacelle and functioned as the CEO's Chief of Staff.  Moreland was effectively in a supervisory role over Thomas.

7.      Since approximately November 20, 2017, Moreland has been employed as the California State Director for HSUS.

8.      HSLF is the lobbying affiliate of HSUS under 26 U.S.C. 501(c)(4).

9.      Moreland and Thomas became acquainted through work, as HSUS and HSLF share office space in Washington, D.C.

10.      On February 24, 2017, Thomas wrote Moreland about scheduling a short meeting with Mr. Pacelle on March 1, 2017.  On February 28, 2017, Moreland replied with Mr. Pacelle's availability.  She concluded: "Thanks so much and hope you have a great night! If you want to connect about it tomorrow in the office feel welcome to visit me and the pups any time. [smile emoji]"

11.      Moreland and Thomas had occasional work-related interactions in the month of March 2017.

12.      At approximately 8:15 p.m. on April 4, 2017, Moreland called Thomas at the office to ask him to email her some documents.  She gave him her personal Gmail address, but he did not contact her through Gmail that night or ever.

13.      During work hours on the afternoons of April 5 and 6, 2017, Moreland and Thomas engaged in two long conversations.  The conversation on April 5, 2017 was approximately one to two (1-2) hours long, and the conversation on April 6, 2017 was approximately three (3) hours long.  During these conversations, Moreland described her dissatisfaction with her job; her extreme state of overwork, such as working 18-20 hour days and getting 3-5 hours of sleep per night; her

frequent visits to a psychiatrist; her feeling that there were a number of serious problems with her supervisor's management style; her contention that she felt she could override Mr. Pacelle in a vote of the Board of Directors of HSUS (Board); her contention that there was a member of the Board who was retiring and shared Moreland's concerns about the organization, and that that member's retirement would be a good opportunity for that member to offer to fund a deep internal review of HSUS; that three members of Moreland's family died in a car accident when she was fifteen (15) years old; that occasionally, her car got locked into the office parking garage, which closed at 7:00 p.m. daily, which was inconvenient, since she almost always worked later than 7:00 p.m. and sometimes needed to access the office later than 7:00 p.m.; that she had a house in Las Vegas that was underwater; that her family lived in the Las Vegas area; that she was very unhappy living in D.C. and would prefer to live on the West Coast; that she only lived in D.C. because of her job; and that she would like to go for a dog walk with Thomas at the National Arboretum. Moreland started crying when she noted her feeling that an ex-boyfriend she kept a picture of on her office mantle was "the only source of stability [she'd] ever had." Moreland and Thomas also discussed the nature of memory, his mother's illness, and the power of positive thinking.

14.     At the time of these conversations, Moreland had been employed in a high-level role at the organization for a number of years, and Thomas had been an entry-level employee there for less than two months. While he agreed with some of the criticisms that Moreland offered of Mr. Pacelle, he had virtually no personal knowledge of any of the items that Moreland willingly and openly raised and discussed.

15.     Complaints of Mr. Pacelle that Thomas reported to Moreland on or about April 5, 2017 included that Thomas believed Pacelle behaved in an inappropriate, sexist manner toward women in the workplace. Moreland spent about twelve hours a day around Pacelle, and frequently traveled with him. On or about April 10, 2017, Thomas also reported to his supervisor, Sara

Amundson, then-Vice President of HSLF, his belief that Mr. Pacelle was engaged in inappropriate, sexist behavior towards women in the workplace. Ms. Amundson said that she herself had "dated" Mr. Pacelle, and that she believed Moreland and Pacelle had a "co-dependency." On or about May 10, 2017, Pacelle emailed Thomas to ask him to come to Pacelle's office. Thomas entered the office and Pacelle stated that he had heard that Thomas had concerns over sexual harassment in the organization. Pacelle claimed that the organization was taking measures to address sexual harassment in the workplace. Thomas never heard anything else about his concerns from Moreland, Amundson, Pacelle, HR, or anyone else at the organization until Moreland would report Thomas to HR in September 2017 and falsely accuse Thomas of making inappropriate criticisms of Pacelle. Upon information and belief, Pacelle resigned in February 2018 amidst allegations that he had engaged in sexual harassment.

16.     At the time of these conversations with Moreland, Thomas had been living in D.C. for approximately two months. He noted that he was hoping at some point to go to the National Zoo to see the animals, and Moreland noted that she wanted to go to the National Arboretum, because Moreland had a dog, people were permitted to walk their dogs there, and that they could go on a dog walk there together. Thomas had never heard of the National Arboretum, but they tentatively agreed to go on a dog walk there at some point. Thomas referenced this in a text message on April 10, 2017.

17.     On April 6, 2017, after the second of these conversations took place, Thomas emailed Moreland: "Talking...was awesome! Thank you! I'm so glad there is someone like you in the organization!" Moreland replied: "It's the first night I've gone home smiling in a very long time! I am so happy we got to do it and hope for many more in the future too. Greatly appreciate you, [Thomas] and so happy that you are here! BTW my number is [phone number]. :)" Moreland clearly did not feel this conversation was inappropriate; on the contrary, she twice wrote the

conversation made her "so happy" and she praised Thomas effusively while giving him her phone number.

18.     Also on the evening of April 6, 2017, Moreland texted Thomas to say that their conversations were so valuable to her that she "felt like [she] should be the one paying $180 or telling my shrink no on tomorrow! Haha."

19.     Moreland contacted Thomas by phone on April 10, 2017 to ask whether he had shared any aspects of these conversations with Mr. Pacelle and to say that she was worried Mr. Pacelle may have become aware of the conversations.  Thomas had not shared any part of those conversations with anyone and told her so.

20.     After speaking with Mr. Pacelle, Moreland texted Thomas on April 10, 2017 to say "so sorry for the false alarm" and "I don't think he heard us talk about him! Phew again I'm so sorry for the moment of panic!"

21.     On Thomas's birthday, April 14, 2017, Thomas emailed his entire half of the office - sixteen (16) people - and offered to buy them takeout Chinese food for lunch.  About six (6) people, including Moreland, took him up on his offer.  Moreland wrote Thomas an email: "HAPPY BIRTHDAY!! So excited to celebrate the big [age] with you! I am totally in for lunch but don't want you to pay! I will pitch in cash. :)  ... Let me know how I can help you and I will go with you to pick it up too!"  Thomas responded: "Thanks! Today you have to let me do what I want, which is to treat everybody and for you not to help with menial tasks :)"  The group all ate together in the breakroom, except for Moreland, who ate alone in her office.  When Thomas dropped her food off in her office, Moreland said that she wanted to "treat" Thomas to a meal, but Thomas declined.

22.     Also on April 14, 2017, Thomas received a group birthday card from the colleagues in his work area.  Moreland had signed it: "Happy birthday [Thomas]. Wishing you all the very best for the year ahead! Glad to have you on board! Cheers, Crystal" Moreland also individually

purchased, signed, and gave Thomas another birthday card with a different and more intimate inscription: "Happy birthday [Thomas]! Wishing you all the best for the year ahead. I am so happy that you're part of the team and grateful for your friendship! Cheers, Crystal + [her dog]"

23.     Again on April 14, 2017 around 9:30 p.m., Moreland texted him to repeat her invitation: "Sorry I didn't get to spend more time with you on your birthday! ... Thank you again for treating us all. I still want to treat you! We will celebrate again when back from CA. Safe travels to [his parents' house] :)"

24.     Thomas *again* rebuffed her unwanted offer "to treat" him and "celebrate" his birthday by refocusing the conversation on work: "Thanks! Did you get your tangerine? So sorry to hear about [Moreland's office colleague] leaving. Lots to discuss, but we can catch up after board meeting."

25.     On April 25, 2017, Moreland texted Thomas: "Can't wait to catch up soon…. Thank you again for your kindness and checking in! Hope all is well for you and look forward to catching up!"

26.     In late April 2017, Moreland verbally invited Thomas to a Sunday brunch, which Thomas referenced in a text message on May 2, 2017.  Thomas did not wish to dine alone with Moreland, and he declined her invitation for a third time in as many weeks.  Thomas downplayed this overture and suggested in a text message on April 30, 2017 that they go for a "walk and talk with [her dog]" (as they had originally discussed) instead of brunch.   Moreland replied, "Yes absolutely!" and "Let's do it", and they scheduled a dog walk for May 7, 2017.

27.     On May 7, 2017, Thomas texted Moreland to confirm.  Moreland replied, "I am so glad you texted you! [sic] I meant to write this morning. I got into a car accident this weekend and everything is fine but [her dog] and I are both really sore and I was wondering if we could rain check."  She told him by phone that she had rear-ended someone, her airbags had gone off, her

dog had been hurt and had vomited, and Moreland herself had been injured.  Thomas asked if there was anything he could do to help.  She texted, "Thank you for understanding! I am doing ok we're just laid up in bed but thank you for offering!" and: "It truly means so much to me, [Thomas]! I am grateful for your friendship and kindness! [heart emoji]"

28.     Though Moreland asked to take a "rain check" because of her car accident, Thomas did not attempt to reschedule.

29.     From May 16-18, 2017, Moreland wrote to Thomas and his boss many times about a work assignment. Thomas completed this assignment at Moreland's direction because Moreland was effectively in a supervisory role over Thomas.

30.     On May 23, 2017, Moreland texted Thomas: "Will you let me know if [her dog] starts to yowl. I will be back very shortly at post office" [sic]

31.     In late May 2017, Thomas told four people at work (two managers and two coworkers) that he had to take bereavement leave because his mother was dying from a neurological disease similar to Lou Gehrig's disease/ALS. On June 1, 2017, as Thomas was leaving work, he confided to Moreland in her office that he was driving home to his parents' house in another state that night because his mother was dying.  Moreland was sympathetic.  Because Thomas was undergoing a once-in-a-lifetime personal crisis, Moreland had confided in him about the loss of her own family members, Moreland's car had just been wrecked, Thomas's car was parked near the office, and she had to take public transportation home, he texted her to offer her a ride home around 8:00 p.m. so they would have more time to discuss his mother's impending death.  Moreland responded around 11:10 p.m. that night, "Just saw this friend. All is well will you please let me know when you're home safe? Really honored you shared with me and please let me know how I can support."

32.     Thomas was the only organization employee (to his knowledge) who had a car parked near the office.  He offered many coworkers rides and/or free use of his car throughout the time he was employed there.  The only night that Thomas ever offered to give Moreland a ride home was immediately after he had just confided in her that he was driving home that night because his mother was dying, when it was impossible that this offer could be misinterpreted.

33.     Thomas drove home to his parents' house from approximately 3:00 a.m. to 5:00 a.m. on June 2, 2017.  He responded to Moreland in an email at 5:23 a.m., "Thanks so much for your texts. I'm so glad I filled you in on everything. I got home safely. I don't know what the future will hold but there's a lot of anger, anxiety, sadness, nausea and volatility. I may not reach out but I know that I can rely on you, and I PROMISE that I'll reach out if I need anything..." They had no further communication in the next two weeks while his mother was passing away.

34.     Thomas's mother passed away around 9:30 p.m. on June 15, 2017, his family brought his mom's body to the funeral home on June 16, 2016, and on June 17, 2017, Thomas returned to Washington, D.C.  Moreland was the only person whom Thomas knew in Washington, D.C. who had similarly confided in him about her own personal family tragedy.  That day, less than forty-eight (48) hours after his mother died, Thomas replied to Moreland's June 1, 2017 text that read, "Really honored you shared with me and please let me know how I can support," and Thomas wrote, "How do you and [Moreland's dog] feel about going for a walk tomorrow?" Moreland did not respond.

35.     Thomas worked in the office at HSLF from June 19 through June 21, 2017 and returned to his father's house on June 22, 2017 for his mother's June 23, 2017 funeral.  Thomas returned to Washington, D.C. on June 25, 2017 and resumed his normal work schedule.

36.     On Friday, June 30, 2017, Moreland emailed Thomas at 5:23 p.m. to invite him to dinner, "I am almost done with Calls!  Want to head out for some snacks around 5:30 pm?" [sic]

Thomas replied, "Sure thing - What's the plan - is there a dog-friendly place? Do you need to be back here before the parking lot closes? Will come by your office at 530 or when you're done with the call to discuss :)" Moreland responded, "I don't know about a dog friendly place. I've been trying to ponder that. Meiwah I think outside lets animals hang out. Possibly café delux does as well. Would you be ok getting back here by 6:30 pm. I carpolled with Wayne and was hoping to have at least until 7pm but he promised [his wife] dinner." [sic]

37.　　Moreland paid for their meal at a restaurant next to the office during a dinner that lasted from approximately 5:40 p.m. to 6:25 p.m.  Thomas was very sad about his mom and he and Moreland talked about death and mourning.  Around 7:30 p.m., Thomas emailed Moreland, "Thanks for the chat and for reaching out. I wish very much that there was something more you or anyone could do. It's so hard for me to access that pain, but when I do, it's great to know that you're there."

38.　　On July 6, 2017, Moreland again texted Thomas to ask him to keep an eye on her dog when she was out of the office: "Will you let me know if [her dog] really starts to yowl."

39.　　On July 20, 2017, Thomas emailed Moreland to let her know that a mutual friend was coming into the office next week.  Moreland joked that Thomas should "kidnap" the friend; Thomas responded that someone should invent a machine that would "clone" their mutual friend and Moreland; and she replied, "You are so sweet! You and [Woman X] are one might machine of your own! We're damn lucky to have you both! … Hope you are doing well and we'll have to catch up soon! See you tomorrow my friend!" [sic]  Thomas replied, "You are awesome! [Thomas's retiring boss] cares about you very much and completely understands. We will catch up soon. Have a beautiful night with your prancing pup [smile emoji]"  Moreland then wrote, "Think [the retiring boss] will be back again soon? … [Her dog] has curled into his bed and totally done for the day. I think I am going to join him! Have a great night and catch up soon. All my best,

Crystal" Thomas responded: "Yes! He'll be back for a week next month and will be a part-time contractor for us at least through mid-January!"

40.     On July 28, 2017, Thomas emailed Moreland and his boss pictures of Moreland's dog in the office with another dog. Moreland replied, "These are so great! Thank you for snapping such an iconic pic!"

41.     On August 1, 2017, Thomas emailed Moreland, "Low priority: Do you have interns' signed copies of Humane Economy? Some were absent on Friday :)" Moreland replied, "Yep there is a bug stack of books for wayne to sign on his desk for those that missed. Thanks for thinking of them and checking in! :)" [sic]

42.     Moreland and Thomas had no subsequent interactions beyond work-related chitchat.

43.     Thomas and Moreland had a genuine, professional, platonic work friendship, and worked together from time to time as part of a larger team.

44.     Thomas had never received a negative evaluation or an HR complaint until the complaint made by Moreland.

45.     At no point between the time Thomas and Moreland met and her accusations against him did Thomas ever engage in any intimidating, hostile, offensive, or otherwise harassing and/or stalking behavior towards Moreland. On the other hand, Moreland maliciously leveled numerous false and offensive accusations about Thomas to Thomas's employer, which, had they been true, would have constituted harassment and stalking.

46.     At no point did Thomas ever want, seek, initiate, or attempt to initiate any romantic or sexual relationship with Moreland. On the other hand, Moreland was in a position of professional power over Thomas, occasionally directed his work activities, and repeatedly asked Thomas out on dates, which he turned down.

47.     At no point did Thomas and Moreland discuss sex or anything related to it.

48.     "Woman X" was employed as a staff member of HSLF during the time of Thomas's employment.  Woman X made repeated sexual overtures to Thomas, which he declined.  On or about May 15, 2017, Woman X specifically asked Thomas to have sex.  He declined, and she became extremely upset.  On or about May 27, 2017, Thomas spent the night at Woman X's apartment and they had sex for the first and only time.  Woman X became infatuated with Thomas, but he did not reciprocate those feelings.  Woman X felt spurned by Thomas, began engaging in passive-aggressive behavior against him, and by August of 2017, she would barely look at or acknowledge Thomas.  On or about September 25, 2017, Woman X discovered that Thomas had had a romantic relationship with another woman.  Woman X cried at her desk throughout the days of September 26 and 27, 2017 and refused to tell anyone at work what was bothering her.

49.     On or about the afternoon of September 27, 2017, Woman X had a two-hour long private meeting with her and Thomas's mutual boss, Ms. Amundson.  Ms. Amundson never told Thomas that she had had this conversation with Woman X, or that Woman X had dated Thomas and had just discovered that Thomas had had a romantic relationship with another individual.

50.     On or about September 28, 2017, Ms. Amundson explicitly told one of Thomas's coworkers at HSLF not to speak to him.  Ms. Amundson never told Thomas about this directive or why she had leveled it.

51.     On or about September 29, 2017, Moreland filed her first HR complaint against Thomas, in which she accused him of criticizing Mr. Pacelle.

52.     On the morning of October 12, 2017, Thomas was called into the office of his direct supervisor, Ms. Amundson.   She called Ursula Norbert from the Human Resources (HR) Department on speakerphone.  Ms. Norbert informed Thomas that Moreland had filed an HR complaint against Thomas in late September 2017 alleging that Thomas had made disparaging

comments about Mr. Pacelle in early April 2017 and that those comments made Moreland "uncomfortable."  Ms. Norbert said Moreland alleged that Thomas had told Moreland that he trusted her more than he trusted Mr. Pacelle.  Thomas said that particular complaint was false, but he acknowledged that he had criticized Mr. Pacelle and said that the criticism was appropriate. Ms. Norbert noted that she had interviewed Moreland about these allegations.  There were no additional charges leveled against Thomas during this conversation, and the word "sex" was not mentioned in the conversation between Ms. Norbert, Ms. Amundson, and Thomas.  Thomas asked what the process was by which accused employees could rebut false allegations, and Ms. Norbert noted that there was no such process.  Thomas did not understand the allegations, and he asked for the allegations in writing.

53.     Thomas and Moreland had no further interactions whatsoever after this point.

54.     On October 12, 2017 at 12:55 p.m., Thomas emailed Norbert, VP of HR Jill Little, and Ms. Amundson, to note that while he disputed Moreland's allegation - i.e., her claim that six months ago, he supposedly had said that he trusted Moreland more than he trusted the CEO - the allegations nevertheless did not constitute wrongdoing and did not meet the definition of harassment according to the employee handbook, under which someone should come forward if certain enumerated behaviors had made that person feel "uncomfortable."  Thomas also shared Moreland's email from immediately after their April conversation in which she was not at all "uncomfortable" but had, in fact, been effusive in her *praise* of Thomas, e.g., "It's the first night I've gone home smiling in a very long time! I am so happy we got to do it and hope for many more in the future too. Greatly appreciate you, [Thomas] and so happy that you are here! BTW my number is [phone number]. :)"

55.     Immediately after Thomas sent this email to HR and copied Ms. Amundson, he saw Ms. Amundson walk to her bookcase and retrieve her copy of the employee handbook.

56.    On or about October 12, 2017, somebody shared Thomas's email with Moreland, and she thereby learned of Thomas's rebuttals of her charges.

57.    On or about October 13, 2017, after Moreland's complaint that Thomas supposedly unfairly criticized Mr. Pacelle did not achieve Moreland's apparent goal of terminating Thomas's employment, Moreland changed her story in communications with Ms. Little, and maliciously invented allegations that fit the description of harassment as defined by the employee handbook.

58.    On the afternoon of October 13, 2017, Thomas received an email from Ms. Little noting that Moreland had made certain complaints about Thomas.  Notably, the nature of these complaints had changed and were entirely different from the complaints that had been leveled against Thomas the previous day, while the older complaint alleging insubordination that Thomas had rebutted was evidently no longer at issue.

59.    According to Ms. Little's email, Moreland *now* accused Thomas of behavior that "made her feel very uncomfortable *and intimidated*" (emphasis added).  According to the HSUS employee handbook, "Creating an intimidating, hostile or offensive work environment" was one aspect of the organization's verbatim definition of harassment (p. 33).  Ms. Little noted that "*if true*, this behavior would violate The HSUS's Policy Against Sexual and Other Types of Harassment."

60.    Also according to the October 13, 2017 email from Ms. Little, Moreland alleged that Thomas had "repeatedly asked her to lunch and dinner."  This was false and defamatory. Moreland asked Thomas out to eat not once but *four* times: twice to "treat" him and celebrate his birthday*,* once to a Sunday brunch, and once to dinner.  Thomas declined each of these first three invitations because he did not wish to have a romantic relationship with Moreland.  The fourth invitation was seven days after his mother's funeral.  Mourning was the topic of conversation, and

he accepted this indisputably platonic invitation from Moreland.  Thomas never asked Moreland
out to eat.

61.    Also according to the October 13, 2017 email from Ms. Little, Moreland alleged
that Thomas had: "texted her on the night of [a colleague's] happy hour while she was drinking a
glass of wine that [another colleague] gave her stating, "since you're drinking now, do you want
me to drive you home?" Crystal said that she looked around the room, but [Thomas was] nowhere
in sight."  This was false and defamatory.  No text message like this exists.

62.    Also according to the October 13, 2017 email from Ms. Little, "[Thomas] texted
her stating that [Thomas] had dropped food off in her lobby (no food was there)."  This was false
and defamatory.  Thomas did not know where Moreland lived and never dropped food off in her
lobby.  No text message like this exists.

63.    Also according to the October 13, 2017 email from Ms. Little, Thomas "followed
her around the office (to the breakroom, restroom and in the hallways) after she returned from the
hospital."  This was false and defamatory.  Thomas never followed Moreland around the office or
anywhere else.

64.    Also according to the October 13, 2017 email from Ms. Little, Thomas "texted her
and asked if [Thomas] could bring food to her house and asked who was looking after her."  Not
only did Thomas not "ask who was looking after her," but this 'complaint' fails to mention the all-
important fact that Moreland had just texted Thomas that she had been in a serious car wreck. The
exact text exchange was:  Thomas: "Does 7 still work for a sweet [dog] walk? I want to be
respectful of your time constraints, so I promise it won't hurt my feelings if something came up
and you have to cancel!!"  Moreland: "I am so glad you texted you! [sic] I meant to write this
morning. I got into a car accident this weekend and everything is fine but [her dog] and I are both
really sore and I was wondering if we could rain check."  Thomas "What? Yes, of course, can I

bring you anything? What's your favorite food and drink?" Moreland: "Thank you for understanding! I am doing ok we're just laid up in bed, but thank you for offering! I hope to be in tomorrow." She then told him by phone that she had rear-ended someone, the airbags had gone off, her dog had been hurt and had vomited, and Moreland herself had been injured. After the call, Thomas was naturally very concerned and texted: "I know we're still getting to know each other, but you're one of my favorite people, and I absolutely insist that you consider me a surrogate [Moreland's good friend] if you need or want anything at all [heart emojis]" Moreland replied: "It truly means so much to me, [Thomas]! I am grateful for your friendship and kindness! [heart emoji]" Thomas's offer to bring Moreland her favorite food and drink after she had to cancel a dog walk because she and her dog had just been injured in a serious car accident was, according to Moreland's own written words at the time, an appropriate and welcome gesture of "friendship and kindness" for which she was "grateful." Moreland intentionally and maliciously withheld this information from her HR complaint in order to present a false image of Thomas and damage him. Part of this charge is false and defamatory, and part is defamatory by implication.

65. Also according to the October 13, 2017 email from Ms. Little, Moreland alleged that Thomas had "asked her why she was in the hospital." Moreland was lying, and this accusation is defamatory. As indisputably demonstrated in the preceding paragraph, Moreland herself texted Thomas and volunteered that she had been in a serious car accident.

66. Also according to the October 13, 2017 email from Ms. Little, Thomas "texted her multiple times asking her to go for a walk." Moreland failed to mention that *Moreland herself initiated these invitations*, as well as the context in which they arose. Voluminous written evidence shows that: Moreland herself had originally suggested that she and Thomas go for a dog walk at the National Arboretum; followed that up with an email that read "It's the first night I've gone home smiling in a very long time! I am so happy we got to do it and hope for many more in the

future;" purchased Thomas her own birthday personal card and inscribed it with a different message than she used to sign the regular office group's card; and offered many unwanted invitations to Thomas within a span of less than a month, such as: asking to spend personal time with Thomas on his birthday, making a verbal offer to treat Thomas around the time of his birthday, texting him to reiterate "Sorry I didn't get to spend more time with you on your birthday! ... Thank you again for treating us all. I still want to treat you! We will celebrate again when back from CA," and verbally inviting him to a Sunday brunch. Thomas was as polite as possible in rebuffing Moreland's clear and repeated advances, and he did not reciprocate her romantic invitations, even though this put Thomas in a difficult situation, as Moreland was in a position of professional power over Thomas. Thomas ignored most overtures, and downplayed her brunch invitation to a dog walk, which Moreland herself had originally suggested, and enthusiastically agreed to. On the day they were scheduled to go for a dog walk, Moreland wrote Thomas to take a "rain check" because of her car accident, and Thomas did not attempt to reschedule.

67.     The one and only time that Thomas proactively reached out to Moreland about going for a walk was two days after his mother died, in direct reply to Moreland's text message, "Really honored you shared with me and please let me know how I can support" and when this was quite clearly platonic. Asserting that this was somehow 'harassment' or 'stalking' is not credible, and constitutes defamation by implication. There was nothing inappropriate about Thomas's conduct in these situations, and Moreland put him in the difficult position of repeatedly refusing her actual date invitations even though he was a new employee and she was in a powerful position within his organization. Moreland intentionally and maliciously withheld this information from her HR complaint.

68.     Also according to the October 13, 2017 email from Ms. Little, Moreland alleged that "when she did agree to go to dinner," Thomas "became upset with her because she could only

stay for 90 [ninety] minutes." This was false and defamatory. Emails show that *Moreland herself invited Thomas to dinner*, *she* "was hoping to have at least until 7," *she* picked the restaurant, *she* selected the time frame, *she* paid for the meal, it lasted forty-five (45) minutes, and Thomas did not "become upset with her" when the dinner was over. During the dinner, which was just seven days after the funeral of Thomas's mother, they discussed grief and loss, as a contemporaneous email demonstrates. Moreland asked Thomas to dinner, and *he* agreed after her many invitations to dine with her only once because he felt this offer was quite clearly platonic and she had offered to "support" him.

69.     Also according to the October 13, 2017 email from Ms. Little, Moreland alleged that Thomas had "repeatedly asked if [Thomas] could drive her home." This is false and defamatory. Thomas offered to give her a ride home once: after Moreland had totaled her car; after Moreland had told him that members of her family had died in a car wreck; and only immediately after Thomas had told Moreland that he was driving home to be with his dying mother *that night*. Moreland intentionally and maliciously withheld this information from her HR complaint.

70.     Also according to the October 13, 2017 email from Ms. Little, Moreland alleged that Thomas had "asked her if she had slept with [Mr. Pacelle]." This was false and defamatory. Thomas never asked her whether she had slept with Mr. Pacelle, and Thomas and Moreland never discussed any sexual topic at any time whatsoever.

71.     Moreland's overarching complaint that she felt "uncomfortable and intimidated" by Thomas is false and defamatory. For example, Moreland herself asked Thomas out to eat no less than four times, Thomas accepted only once, and, on July 20, 2017, **after all of the above alleged events had supposedly taken place that Moreland would later claim "made her feel very uncomfortable and intimidated," Moreland wrote to Thomas in an email: "You are so**

**sweet!"; "We're damn lucky to have you and [Woman X]"; and "Hope you are doing well**
**and we'll have to catch up soon! See you tomorrow my friend!"**

72.    Also according to the October 13, 2017 email from Ms. Little, "in September,"
Thomas "made a reference to an incident that happened to a friend of hers earlier this summer that
she had not shared with Thomas or anyone else at the HSUS."  Thomas noted to HR that this
accusation was completely false, but, despite his request, Thomas never received any more
information about "an incident that happened to a friend of hers" that summer and about which he
both supposedly had gained secret knowledge and somehow "made a reference to."  The reason
that Thomas never received more information about this allegation is because Moreland had
fabricated it.

73.    Moreland invented these and similar bizarre allegations in order to falsely portray
Thomas as a stalker and get him fired.  Moreland also made the allegation about a "reference"
Thomas had made "in September" 2017 in order to hide the proximate cause of her complaints to
HR in September 2017: Moreland's jealousy, malice, and spitefulness over discovering that
Thomas had engaged in a relationship with someone other than Moreland.

74.    Moreland was motivated by malice and bad faith to report false and misleading
allegations against Thomas because: 1) Moreland wanted to protect Mr. Pacelle, with whom
Moreland had a unique "co-dependency," according to Ms. Amundson, from allegations of
inappropriate sexist behavior towards women that later led to Pacelle's termination; 2) Moreland
wanted to cover up the fact that she, in her role as effectively Thomas's supervisor, had
inappropriately asked Thomas out many times, and Thomas had rejected her romantic advances;
3) Moreland was jealous and spiteful of the fact that, after Thomas had rejected Moreland, Thomas
had engaged in a romantic relationship with somebody other than Moreland; and 4) Moreland
would not have been able to achieve her goal of Thomas's termination if she had told the truth.

75.     Moreland used her power within the organization to maliciously influence the investigation in a way that would conceal both her lies and her true motives for filing grievances against Thomas.

76.     Within an hour of receiving Ms. Little's email late on a Friday afternoon, Thomas voluntarily provided to the HR Department all text messages ever sent between him and Moreland. They demonstrated Moreland was fabricating her text message allegations.   He received no response.

77.     On Saturday, October 14, 2017, Thomas voluntarily printed off all emails exchanged between Moreland and himself (other than large group chain emails that were not relevant to the matter at hand).  Thomas also provided a narrative denial of other charges, and he placed other events in the all-important context that Moreland had failed to disclose, i.e., communications that occurred in the time immediately surrounding the death of Thomas's mother. Thomas placed these emails in a binder in his desk and emailed HR letting them know that they were free to pick them up at any time.  He also individually forwarded a handful of these emails to HR.  He received no response.  At some point in the following week when Thomas was out of the office, somebody removed the printed emails from his desk.

78.     On October 14, 2017, Thomas reported to Ms. Little, Ms. Norbert, and Ms. Amundson: "Crystal is victimizing me and creating an atmosphere of hostility and intimidation in which I'm unable to function personally or professionally. She has abused her power over me. She has defamed me and caused reputational injury to me amongst a group of coworkers, in addition to causing emotional pain and a loss of all the time I've had to spend on this."  Thomas received no response.

79.     On October 15, 2017, Thomas reported to Ms. Little, Ms. Norbert, and Ms. Amundson: "Despite my clear, written pleas for help, I have received no acknowledgement,

concern, support, or any other communication from the HR Department. I AM IN FEAR FOR MY

PHYSICAL SAFETY AND YOU HAVE DONE NOTHING ABOUT IT."  Thomas received no

response.

80.     On or about October 16, 2017, HSUS appointed lawyer Becky Branzell from the

Office of General Counsel (OGC) to oversee and/or conduct the investigation into Moreland's

allegations against Thomas.

81.     Thomas had saved all birthday and thank you cards that people at the organization

had given him throughout the year.  He scanned the birthday card Moreland had given him and

emailed it to HR and Ms. Branzell, and he wrote that they could pick up the card from his desk at

any time if they wanted to have it.  He received no response, and nobody ever came to pick up the

card.

82.     Thomas provided his work laptop to HSUS immediately after OGC requested it for

analysis.  He received no further communication about their findings, and, regardless, he had

already provided investigators copies of all communications between he and Moreland (except for

irrelevant large group chain emails).

83.     Upon information and belief, Moreland was interviewed a number of times by the

organization, and she maliciously engaged in numerous written and spoken communications with

investigators.

84.     At no point after Thomas was advised on October 13, 2017 of the allegations made

against him did anyone from the organization ever: interview Thomas; send Thomas written

questions; let Thomas know how he could clear his name; provide Thomas any other opportunity

to address the allegations; respond to the evidence Thomas presented; ask Thomas anything about

the allegations whatsoever; reply to Thomas's questions about the allegations; or respond to or

investigate Thomas's allegations against Moreland.

85.     While Moreland received emails that Thomas wrote to rebut her false accusations, Thomas never received any of Moreland's communications concerning her allegations or responses to his rebuttals.

86.     Since Moreland only sometimes worked in the D.C. (Thomas's) office, Thomas asked for and was provided the days that Moreland was working in the D.C. office so he could avoid her. Moreland worked in the D.C. office from October 16 through 20, 2017 and Thomas worked from home from October 16 through 20, 2017 because he feared what else Moreland might do to harm him.  However, he was unable to carry out his principal job duties from home, and, thereafter returned to work at the D.C. office.

87.     While Thomas would almost always work late hours before Moreland's accusations, he left work early every day after Moreland's allegations if she also happened to be in the office.

88.     On or about October 16, 2017, Moreland became aware that Thomas felt that Moreland was making defamatory claims against him and he had hired an attorney.

89.     Thomas's cubicle was about twenty feet from and halfway between the offices of Moreland and Ms. Amundson.  Thomas could see who entered Amundson's private office from his desk, and Moreland's office had glass walls that allowed anyone to see whom she was speaking to.  On the afternoon of October 24, 2017, Moreland and Amundson met privately away from the office.

90.     On November 8, 2017 at 10:30 a.m., Thomas was called into Ms. Amundson's office. Ms. Little from HR was also present, and she informed Thomas that she would read him information from a sheet of paper. Thomas asked if this had to do with Moreland's accusations, and Ms. Little said, "Yes."  Thomas was given three to five (3-5) minutes to call his lawyer privately, but he was unable to reach her.  At approximately 10:35 a.m., Ms. Little informed

Thomas that he had been terminated, must leave the building immediately or be escorted out by security, and that the organization would mail him his personal property.

91.     When her malicious attempts against Thomas failed in the face of countervailing evidence, Moreland invented a series of increasingly strident lies to explain her contradictions. Thomas was never given a chance to rebut these allegations and was not even informed about the most serious allegations until after he was fired for them.

92.     After Thomas was fired, he learned that Moreland had leveled additional false, defamatory and malicious accusations against him that HR/OGC believed and that caused his termination.  After Thomas demonstrated to HSUS that Moreland had invited *him* to dinner, and not the other way around as Moreland had claimed, Moreland was left to attempt to explain why she would invite someone who supposedly made her feel "very uncomfortable and intimidated" a) out to dinner; b) away from the office; c) after work hours; d) on a Friday evening; e) and pay for his meal.  According to a November 17, 2017, letter from HSUS' attorney Karla Grossenbacher, Moreland's explanation was that: "Finally, after being pestered repeatedly, Ms. Moreland ultimately went to Café Deluxe with him for a quick bite to eat and only then with the knowledge that two other HSUS employees would be present at all times at another table in the restaurant. Ms. Moreland paid for the meal to mollify [Thomas] who became inordinately upset when Ms. Moreland made clear she was cutting their time together shorter than he wished."  This was a completely malicious fabrication; is defamatory; and, unbelievably, **Moreland changed her story after Thomas showed that he turned down Moreland's, repeated, unwanted, private invitations to "treat" him to meals by maliciously attempting to reframe Moreland inviting and paying for Thomas on a Friday night dinner to discuss Thomas's mother's recent death as a harassment / stalking claim against Thomas.**  Moreland kept silent about these disturbing allegations for more than four months; did not report this to HR as part of her series of September

or October complaints against him; and only "reported" this to HR after Thomas pointed out to

HR that she was lying about her claim that he had invited her to dinner.  Nevertheless, she made

this extremely offensive and reprehensible allegation, and Thomas only found out about it after he

had been fired and HSUS' lawyer gave it as a reason for his termination.

93.     On or about the afternoon of November 8, 2017, in a phone conversation between

Ms. Branzell and Thomas's lawyer, Branzell stated that the text messages that Moreland and

Thomas provided to investigators were identical and supported *Thomas's* story, not Moreland's;

however, when Moreland was asked by OGC why she could not reproduce the text messages that

she claimed existed, Moreland falsely claimed that she could not reproduce them due to "technical

difficulties."  This was maliciously false and defamatory: in fact, she could not reproduce them

because she had lied about their existence.  Admitting that Thomas was telling the truth about these

text messages would have demonstrated that Moreland was lying; therefore, she continued to lie

about these text messages and never did produce them.  Thomas was never given a chance to

address this brazen falsehood and learned about it only after he had been fired.

94.     HSLF terminated Thomas due to Moreland's malicious and false allegations about

and malicious actions concerning Thomas.

95.     On or about November 20, 2017, Moreland moved to Hollywood to begin work as

the new California State Director of HSUS.

96.     From November 8, 2017 through August 10, 2018, Moreland has continued to

maliciously conceal evidence from HSUS that would exonerate Thomas of her false charges

against him.

## COUNT I - DEFAMATION

97.     Thomas hereby incorporates as though restated each of the factual allegations stated

in paragraph 1 through 96.

98.     Stalking is a crime under D.C. Code §22–3133, and falsely accusing an individual of stalking is defamation *per se*.

99.     Moreland maliciously made false and *per se* defamatory statements to HSUS and HSLF in bad faith concerning Thomas, including statements indicating that he stalked her.

100.    Moreland maliciously published false and *per se* defamatory statements to HSUS and HSLF about Thomas in bad faith and without privilege.

101.    Moreland acted with malice when publishing such false and *per se* defamatory statements about Thomas.

102.    Moreland maliciously made and published statements to HSUS and HSLF in bad faith and without privilege about Thomas that constitute defamation by implication.

103.    The malicious publication of Moreland's false statements constitute defamation *per se* and defamation by implication.  Moreland's defamation caused Thomas special harm, specifically causing him to lose his job with HSLF, to suffer injury in his profession or community standing, and to lower him in the estimation of the community.  The damage that Moreland wrought has been so severe that Thomas has sought suicide prevention services.

104.    As a direct and proximate result of Moreland's conduct, Thomas has sustained, and continues to sustain, damages and injury to his reputation, including but not limited to lost wages, lost future business expectancies, and loss of goodwill, justifying an award of compensatory damages in an amount to be determined at trial.

105.    Thomas is also entitled to an award of punitive damages, as Moreland has acted maliciously, willfully, with conscious indifference and reckless disregard of Thomas's rights.


WHEREFORE, Thomas prays that the Court enter judgment against Moreland and requests an award of compensatory and punitive damages in the amount of two million nine

hundred and fifty thousand dollars ($2,950,000.00), attorneys' fees, costs, and such other relief as this Court deems fair and appropriate.

Respectfully submitted,

**THE SELTZER LAW FIRM**

s/ Diane A. Seltzer Torre
Diane A. Seltzer Torre, Esquire
DC Bar No. 434571
4800 Hampden Lane, Suite 200
Bethesda, MD  20814
301-500-1550
dseltzer@seltzerlawfirm.com
Attorneys for Plaintiff Jeffrey Thomas, Jr.

Dated: March 11, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of March, 2019, I caused to be served on counsel for Defendant, via the CM/ECF system, a copy of the foregoing Amended Complaint.

s/Diane A. Seltzer Torre
Diane A. Seltzer Torre