**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JEFFREY THOMAS, JR.,

     *Plaintiff,*

   v.

CRYSTAL MORELAND,

     *Defendant.*

Civil Action No. 18-800 (TJK)

<u>**UNDER SEAL**</u>

<u>**MEMORANDUM OPINION**</u>

Over five years ago, Jeffrey Thomas, Jr. sued Crystal Moreland for allegedly defaming him by reporting his conduct to their employer when the two worked together. The parties then fought tooth and nail over the scope of this case's protective order, motions to compel discovery, motions for sanctions, and more. After Moreland moved for summary judgment, Thomas moved to voluntarily dismiss the case. But it was a false alarm—he withdrew his motion. Now, Moreland renews her summary-judgment motion. Thomas opposes, and also moves for discovery under Federal Rule of Civil Procedure 56(d). There is no reason to prolong these proceedings any further. As explained below, the Court will deny Thomas's motion, grant Moreland's, and enter summary judgment for Moreland.

## I.  Background

The dispute at the center of this case begins with Thomas's unusual request to work for the Humane Society Legislative Fund ("HSLF"), the legislative and political organization affiliated with the Humane Society of the United States ("HSUS"). ECF No. 209-3 ¶¶ 1, 4, 7. In 2016, Thomas was a "major donor" who had donated hundreds of thousands of dollars to HSUS. *Id.* ¶ 5. Even so, he proposed to HSUS working as a policy analyst for a starting annual salary of $35,000

in exchange for $50,000 annual donations. *Id.* ¶ 7. In early 2017, then-CEO of HSUS Wayne Pacelle accepted the proposal and hired Thomas. *Id.* ¶¶ 9, 12. Thomas began his work with the organization in February 2017, and during his employment, he reported to, among others, Sara Amundson, then-Executive Director and Senior Vice President of HLSF. *Id.* ¶¶ 13–14; ECF No. 198-11 ¶ 3.

Through Thomas's work for HSUS, he met Moreland. During the time relevant to this litigation, Moreland was the Programs Advisor and Special Assistant to the President and CEO— Pacelle. ECF No. 209-3 ¶ 2. When Thomas joined HSUS, Moreland knew that Thomas was a donor and of the "prospective donations-for-employment arrangement." *Id.* ¶ 8. Moreland did not directly supervise Thomas. *Id.* ¶15. Thomas and Moreland were also situated close to one another in the HSUS office. *See* ECF No. 203-7 (floorplan showing Moreland's office relative to Thomas's cubicle); ECF No. 209-3 ¶¶ 24, 110. And Moreland's office had a transparent glass wall such that Thomas could look inside it while near his cubicle, and one occasion take photographs. *See* ECF No. 209-3 ¶¶ 24, 218; ECF No. 209-8 (photograph).

On April 5, 2017, Moreland entered the women's bathroom while Thomas waited nearby for her to exit. ECF No. 209-3 ¶ 25. Once she did, Thomas approached her, and they spoke at length. *Id.* ¶¶ 25–26. Later that day, Thomas emailed Moreland, providing his phone number and telling her that he "can give free rides to sweet pups" (a reference to Moreland's dog, Dre) and that "it's never too early, late or trivial to call or text to chat or to get help." *Id.* ¶ 27; ECF No. 198-27. The next day, Thomas emailed Moreland once more, stating, "Talking . . . was awesome! Thank you! I'm so glad there is someone like you in the organization." ECF No. 209-3 ¶ 28; ECF No 198-28. Moreland responded: "It's the first night I've gone home smiling in a very long time! I am so happy we got to do it and hope for many more in the future too. Greatly appreciate you,

[Thomas] and so happy you are here!"  ECF No. 209-3 ¶ 29; ECF No. 198-28.  Moreland then gave Thomas *her* phone number.  ECF No. 209-3 ¶ 29; ECF No. 198-28.

So began a monthslong series of communications by text between Thomas and Moreland. Thomas texted Moreland first, about 20 minutes after receiving her number on April 6, 2017.  *See* ECF No. 209-3 ¶¶ 28–29; ECF No. 198-19 at 11.  The two then exchanged several dozen texts between April 6 and July 21, 2017.  ECF No. 209-3 ¶ 31; ECF No. 198-19.  Among other things, their texts reflect that at least once Thomas offered to give Moreland a ride home and more than once asked if she wanted to go on a walk with Dre.  *See, e.g.*, ECF No. 198-19 at 7 ("This time next Sunday would be a perfect time for a walk and talk with Dre if you're in town!  The magic hour[.]"); *id.* at 3 ("Happy to give you and Dre a ride home."); *id.* ("How do you and Dre feel about going for a walk tomorrow?").

According to Moreland, though, Thomas was engaging in a "pattern of behavior that made [her] uncomfortable."  ECF No. 198-5 at 17–18; ECF No. 209-3 ¶¶ 39–42, 48.  For instance, Moreland expressed concerns that Thomas took an "excessive interest in the organization, [was] mischaracterizing things he was observing in the workplace, and just having a fixation on probing questions about an array of topics throughout the organization."  ECF No. 198-5 at 16.  In Moreland's view, Thomas would "seek[] out problems within the organization," which she thought could suggest "opposition to the Humane Society, given the controversial topics that the organization works on."  *Id.* at 18.  Beyond his conduct aimed at Humane Society, Moreland also testified that Thomas had "excessive interests about [her] specifically," and "follow[ed] [her] around the organization, attempting to get in one-on-one conversations."  *Id.* at 17; *see also id.* at 25 (Moreland testifying that Thomas was "observing . . . everything that [she] was doing, whether it related to work or conversations that [she] was having in [her] office, and just his excessive interest,

following m[e] around, you know, staying for hours that [she] felt were probably outside of his working duties, just because [she] was there").

Moreland first raised such concerns about Thomas, including about HSUS's information security, with HSUS's Office of General Counsel ("OGC") shortly after he began working at HSUS. ECF No. 198-5 at 26–28; ECF No. 209-3 ¶¶ 49, 100; ECF No. 198-7 at 41. In a subsequent investigation, HSUS searched for whether there were any recording devices, keyloggers, or other evidence that Thomas was spying on Moreland, but found none. ECF No. 209-3 ¶ 50; ECF No. 198-7 at 21–22. Moreland later met with OGC on September 17, 2017, about her concerns with Thomas, and then also provided her cellphone to OGC for imaging. ECF No. 209-3 ¶¶ 51–52.

On September 28, 2017, Ursula Norbert, then-Director of Employee Relations and Recruitment in the HSUS Human Resources ("HR") department, called Moreland to discuss her concerns. ECF No. 209-3 ¶ 54. She spoke with Moreland in her official HR capacity. *Id.* ¶ 55. Moreland testified that, at the time, she did not know the reason for Norbert's call, and so first thought it had to do with hiring her replacement, because she would soon be moving to California. ECF No. 198-5 at 48–49; ECF No. 209-3 ¶ 56. But once Norbert asked about Thomas, Moreland expressed her concerns about Thomas's conduct in the workplace, including toward her personally, and potentially in opposition to HSUS. *See* ECF No. 198-5 at 49–50; ECF No. 209-3 ¶ 59. Only Moreland and Norbert were present for the roughly two-and-a-half-hour-long conversation. *See* ECF No. 198-5 at 49; ECF No. 198-17 at 2; ECF No. 209-3 ¶ 65. Moreland says she did not have her computer or phone during the meeting. ECF No. 209-3 ¶ 58. And only Norbert took notes, which were not a verbatim recording of what Moreland, a fast talker, said. *Id.* ¶¶ 60–61; ECF

No. 198-17.  At least at that time, Moreland did not review the notes for accuracy.  ECF No. 209-3 ¶ 62.

After Norbert and Moreland's meeting, Norbert and Amundson met with Thomas on October 12, 2017, to discuss what Moreland had told Norbert.  ECF No. 209-3 ¶ 74.  Norbert testified that the purpose "was not punitive at all" but was to "hav[e] a conversation with him" because they "wanted him to be successful with the organization."  ECF No. 198-8 at 15–16.  Norbert also testified that, during the conversation, Thomas behaved "unprofessional[ly]," "blew up," got "very loud," and threw a "tantrum."  ECF No. 209-3 ¶¶ 79–80; ECF No. 198-8 at 17–19.  After their meeting, Thomas emailed Norbert, accusing her of "hostility."  ECF No. 209-3 ¶ 81.

Thomas also requested that Moreland's "accusations" be set out in writing.  ECF No. 209-3 ¶ 83.  As he requested, on October 13, 2017, Jill Little, HSUS's Senior Vice President of Human Capital and Development, emailed Thomas with a bulleted list summarizing Moreland's comments to Norbert.  *Id.* ¶ 84.  After emphasizing that there had "been no determination made that [Thomas] violated any policy or engaged in harassment," her email provided in relevant part:

> [Moreland's] complaint alleges that the following incidents have occurred over the course of the past seven months and that they have made her feel very uncomfortable and intimidated:
>
> o  You asked her if she had slept with Wayne [Pacelle];
> o  You have repeatedly asked her to lunch and dinner;
> o  When she did agree to go to dinner with you once, you became upset with her because she could only stay for 90 minutes;
> o  You have repeatedly asked if you could drive her home;
> o  You asked her why she was in the hospital;
> o  You followed her around the office (to the breakroom, restroom, and in the hallways) after she returned from the hospital;
> o  You texted her and asked if you could bring food to her house and asked who was looking after her; you then sent her another text stating that you had dropped food off in her lobby (no food was there);
> o  You texted her multiple times asking her to go for a walk;

> > ○ You texted her on the night of Ryan Ososki's happy hour while she was drinking a glass of wine that Tracie gave her stating "since you're drinking now, do you want me to drive you home?" [Moreland] said that she looked around the room, but that you were nowhere in sight; and
> >
> > ○ Most recently (in September), you made a reference to an incident that happened to a friend of hers earlier this summer that she had not shared with you or anyone else at the HSUS;
>
> *If true*, this behavior would violate The HSUS's Policy Against Sexual and Other Types of Harassment.

ECF No. 198-16 at 2–3.

HSUS then continued to investigate Thomas. *See* ECF No. 209-3 ¶¶ 87–104. And by November 2017, it had decided to terminate him. *Id.* ¶ 105; ECF No. 198-20.

A few months later, in March 2018, Thomas sued Moreland in Superior Court of District of Columbia for one count of defamation, which Moreland removed to this Court. ECF No. 1. In the amended complaint, Thomas challenges fourteen statements that he attributes to Moreland as defamatory.[1] ECF No. 22 ("Am. Compl.") ¶¶ 59–73, 92–93. The first twelve are from the above email sent by Little to Thomas on October 13, 2017. *Id.* ¶¶ 59–73. The other two are, first, a statement from HSUS's attorney Karla Grossenbacher made on November 17, 2017, and second, a statement made by OGC's Becky Branzell on a phone call with Thomas's attorney on November 8, 2017. *Id.* ¶¶ 92–93. In an interrogatory, Thomas confirmed that these fourteen statements comprise "each and every statement of fact by Ms. Moreland that [Thomas] contend[s] is both false and defamatory." ECF No. 198-24 at 6–7. Together, the Court will refer to the statements according to the following numeration, with "you" referring to Thomas and "her" to Moreland:

> Statement 1.    Thomas "made her feel very uncomfortable and intimidated," ECF No. 198-16 at 2; ECF No. 198-24 at 6; Am. Compl. ¶ 59;

---

[1] Thomas now takes issue with other statements by Moreland. *See generally* ECF No. 203. But as explained below, because he has not alleged them in the operative complaint, he may not now rest a defamation case on them.

Statement 2.    "You asked her if she had slept with [Pacelle]," ECF No. 198-16 at 2; ECF No. 198-24 at 7; Am. Compl. ¶ 70;

Statement 3.    "You have repeatedly asked her to lunch and dinner," ECF No. 198-16 at 2; ECF No. 198-24 at 6; Am. Compl. ¶ 60;

Statement 4.    "When she did agree to go to dinner with you once, you became upset with her because she could only stay for 90 minutes," ECF No. 198-16 at 2; ECF No. 198-24 at 7; Am. Compl. ¶ 68;

Statement 5.    "You have repeatedly asked if you could drive her home," ECF No. 198-16 at 2; ECF No. 198-24 at 7; Am. Compl. ¶ 69;

Statement 6.    "You asked her why she was in the hospital," ECF No. 198-16 at 2; ECF No. 198-24 at 7; Am. Compl. ¶ 65;

Statement 7.    "You followed her around the office (to the breakroom, restroom, and in the hallways) after she returned from the hospital," ECF No. 198-16 at 2; ECF No. 198-24 at 6; Am. Compl. ¶ 63;

Statement 8.    "You texted her and asked if you could bring food to her house and asked who was looking after her," ECF No. 198-16 at 2; ECF No. 198-24 at 6; Am. Compl. ¶ 64;

Statement 9.    "You then sent her another text stating that you had dropped food off in her lobby (no food was there)," ECF No. 198-16 at 2; ECF No. 198-24 at 6; Am. Compl. ¶ 62;

Statement 10.    "You texted her multiple times asking her to go for a walk," ECF No. 198-16 at 2; ECF No. 198-24 at 7; Am. Compl. ¶ 66;

Statement 11.    "You texted her on the night of Ryan Ososki's happy hour while she was drinking a glass of wine that Tracie gave her stating 'since you're drinking now, do you want me to drive you home?' Crystal said that she looked around the room, but that you were nowhere in sight," ECF No. 198-16 at 2; ECF No. 198-24 at 6; Am. Compl. ¶ 61;

Statement 12.    "Most recently (in September [2017]), you made a reference to an incident that happened to a friend of hers earlier this summer that she had not shared with you or anyone else at the HSUS," ECF No. 198-16 at 2; ECF No. 198-24 at 6; Am. Compl. ¶ 72;

Statement 13.    Grossenbacher stated that Moreland only went to a café with Thomas "with the knowledge that two other HSUS employees

would be present at all times at another table in the restaurant," Am. Compl. ¶ 92; ECF No. 198-24 at 6; ECF No. 198-22 at 3 (Letter from Grossenbacher to Thomas's attorney); and

Statement 14. "On or about the afternoon of November 8, 2017, in a phone conversation between Ms. Branzell and Thomas's lawyer, Branzell stated that the text messages that Moreland and Thomas provided to investigators were identical and supported Thomas's story, not Moreland's; however, when Moreland was asked by OGC why she could not reproduce the text messages that she claimed existed, Moreland falsely claimed that she could not reproduce them due to 'technical difficulties,'" Am. Compl. ¶ 93; ECF No. 198-24 at 6.

Moreland now renews her motion for summary judgment. ECF Nos. 197, 198-2.[2] Thomas opposes. ECF No. 203. Separately, Thomas moves under Rule 56(d) for a host of relief, which he asks the Court to grant before reaching Moreland's summary-judgment motion. ECF No. 206. Moreland, in turn, opposes Thomas's motion. ECF No. 207.[3]

## II.    Analysis

The Court's analysis proceeds in three steps. First, as threshold matter, the Court clarifies that Thomas may not seek to rest his defamation claims on any statements other than Statements 1–14, despite his attempts to broaden his allegations in his briefing on the pending motions. Second, the Court turns to Thomas's Rule 56(d) motion. That motion requests some seven categories of discovery and related relief. But these requests, in additional to being untimely, have either already been decided by the Court, lack merit, or both. Thus, the Court will deny Thomas's Rule 56(d) motion. Third, the Court takes up Moreland's motion for summary judgment. Moreland argues that she is entitled to summary judgment for many reasons, but the Court need reach only

---

[2] The Court vacated Moreland's initial motion for summary judgment in late 2021, ECF Nos. 141, 142, after Thomas moved to voluntarily dismiss the case, *see* Min. Order of Oct. 3, 2022. Thomas later withdrew his motion to voluntarily dismiss. ECF No. 192.

[3] The Court will separately address the parties' motions to seal and unseal briefing relating to these motions. *See* ECF No. 216.

a few.  In short, Moreland is entitled to summary judgment on Statements 13 and 14 because they do not concern Thomas.  And she is entitled to the same on Statements 1–12 because there is no genuine dispute of material fact that the common-interest privilege applies to them.  Thus, the Court will grant Moreland's motion and enter judgment in her favor.

### A.   The Statements at Issue

In his briefing on the pending motions, Thomas tries to muddy the waters about the statements on which his defamation claims rest.  So before turning to the motions, the Court will clarify the statements that are properly at issue.  Of course, the allegations in the operative complaint govern because "[i]t is well established that a plaintiff cannot broaden [his] complaint in a summary-judgment opposition brief."  *Chatman v. Perdue*, No. 17-cv-1826 (JEB), 2020 WL 6075678, at *4 (D.D.C. Oct. 15, 2020) (collecting cases); *Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d 33, 41 (D.D.C. 2010) ("A plaintiff may not assert new allegations at the summary judgment stage if such allegations amount to a 'fundamental change' in the nature of plaintiff's claims.") (citation omitted), *aff'd*, 748 F.3d 1285 (D.C. Cir. 2014).  This principle applies with full force in the defamation context.  *See, e.g.*, *Thompson v. Campbell*, 845 F. Supp. 665, 680 (D. Minn. 1994) ("The scope of [Plaintiff's] defamation claim is limited to the allegations of the complaint"); *Marten v. Yellow Freight Sys., Inc.*, 993 F. Supp. 822, 829 (D. Kan. 1998); *see also* ECF No. 209-2 at 17–18 (Moreland collecting cases).  On top of that, Thomas confirmed that Statements 1–14 comprise "each and every statement of fact by Ms. Moreland that [he] contend[s] is both false and defamatory."  ECF No. 198-24 at 6–7.  Thus, Thomas can base his defamation claims only the statements Thomas alleged Moreland made in his amended complaint—Statements 1–14.  *See* Am. Compl. ¶¶ 57–73, 92–93.

Attempting to skirt this limitation, in his Rule 56(d) motion and summary-judgment opposition, Thomas leans heavily on a set of statements that appear nowhere in the amended complaint or his interrogatory answer outlining the exclusive list of statements he maintained are false and defamatory.  Those statements include Moreland's purportedly accusing Thomas of "wiretapping," being a "mole," "stalking," or having a "mental illness" like "Asperger's syndrome."  *See generally* ECF Nos. 203, 209-3.  The words "wiretapping," "mole," "mental illness," and "Asperger's" do not even appear in the amended complaint, and so Thomas's novel theories that Moreland defamed Thomas by accusing him of these things are not properly before the Court.  The amended complaint includes general references to "stalking."  Am. Compl. ¶¶ 45, 67, 73, 92, 98, 99.  Most concretely, it alleges that Moreland made statements *"indicating* that [Thomas] stalked her" or made statements in order to "falsely *portray* Thomas as a stalker."  Am Compl. ¶¶ 73, 99 (emphases added).  But how Thomas (or anyone else) interprets Moreland's statements or the reasons animating her statements are no substitute for the statements themselves.  And the amended complaint lacks any allegation that Moreland specifically (and defamatorily) *stated* that Thomas had stalked her or was a stalker.  So it necessarily omits the details, including "the time, place, content, speaker, and listener," necessary to plead a defamatory "stalking" statement.  *See Caudle v. Thomason*, 942 F. Supp. 635, 638 (D.D.C. 1996) (citation omitted).  By failing to plead any statements by Moreland related to "stalking," "mole[s]," "wiretapping," "mental illness," or "Asperger's," Thomas may not now rely on any such statements in support of a defamation claim.  Thus, in adjudicating the motions before it, the Court considers only defamation claims based on Statements 1–14.[4]

---

[4] Thomas has not again sought leave to amend his complaint, but the Court would have denied such a request anyway for coming long past "the filing of the[] initial [amended] complaint

### B.    Thomas's Rule 56(d) Motion

Thomas takes another tack to broaden the scope of the case by moving for Rule 56(d) relief. The Court will deny the motion because it lacks merit.

### 1.    Legal Standard

Rule 56(d) provides that in response to a party moving for summary judgment, if the movant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

Courts may grant Rule 56(d) relief in their discretion. *Freedom Watch, Inc. v. Obama*, 930 F. Supp. 2d 98, 102 (D.D.C. 2013), *aff'd*, 559 F. App'x 1 (D.C. Cir. 2014). And "[u]nder the abuse of discretion standard that governs discovery disputes, a trial court's authority is at its zenith." *U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 26 (D.C. Cir. 2014). For Rule 56(d) relief to be appropriate, the requesting party's affidavit must: (1) "outline the particular facts he intends to discover and why those facts are necessary to the litigation"; (2) "explain why he could not produce the facts in opposition to the motion for summary judgment"; and (3) "show the information is in fact discoverable." *Convertino v. DOJ*, 684 F.3d 93, 99–100 (D.C. Cir. 2012) (cleaned up). This "three-fold burden" rests on the Rule 56(d) movant. *Cogdell v. Kale*, No. 19-cv-2462 (RC), 2021 WL 2416904, at *2 (D.D.C. June 14, 2021). And the Court "should carefully scrutinize a Rule 56(d) affidavit" to determine whether the movant has met it. *Davis v. Yellen*, No. 08-cv-447 (KBJ), 2021 WL 2566763, at *18 (D.D.C. June 22, 2021) (citation omitted).

---

and after dispositive motions had been filed and opposed." *Wilderness Soc. v. Griles*, 824 F.2d 4, 19 (D.C. Cir. 1987); *see also Teltschik*, 683 F. Supp. 2d at 42.

Under the first *Convertino* requirement, a Rule 56(d) movant must "'state concretely' why additional discovery is needed." *U.S. ex rel. Folliard v. Gov't Acquisitions, Inc*., 880 F. Supp. 2d 36, 41 (D.D.C. 2012) (quoting *Messina v. Krakower*, 439 F.3d 755, 762 (D.C. Cir. 2006)), *aff'd*, 764 F.3d 19 (D.C. Cir. 2014). Plaintiffs cannot merely "recite broad categories of information." *Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 532 (D.C. Cir. 2019). And if a court's reso-lution "of the [summary-judgment] motion would not change even if the responding party suc-cessfully discovered all the information it sought in its Rule 56(d) affidavit, then the party has not shown why additional discovery is necessary." *See United States v. Bolton*, 514 F. Supp. 3d 158, 165 (D.D.C. 2021) (denying Rule 56(d) motion where evidence sought would not "cure[] the fatal flaws" with the movant's legal theory) (citation omitted); *see also Est. of Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 35 (D.D.C. 2010) (A Rule 56(d) affidavit "must demonstrate that further specified discovery will defeat a summary judgment motion.") (citation omitted), *aff'd*, 651 F.3d 118 (D.C. Cir. 2011).

The second criterion requires a Rule 56(d) movant to explain why he failed to get the re-quested discovery earlier. As the D.C. Circuit "has long recognized," "a party opposing summary judgment needs a 'reasonable opportunity' to complete discovery before responding to a summary judgment motion," and "'insufficient time or opportunity to engage in discovery' is cause to defer decision on the motion." *Khan v. Parsons Glob. Servs., Ltd.*, 428 F.3d 1079, 1087 (D.C. Cir. 2005). Rule 56(d) thus serves to prevent a movant from being "'railroaded' by a premature motion for summary judgment." *Folliard*, 880 F. Supp. 2d at 41 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)). Still, "[a]t a minimum, to benefit from Rule 56(d), a party must show that it has diligently pursued discovery." *SEIU Nat'l Indus. Pension Fund v. Castle Hill Health Care Providers, LLC*, 312 F.R.D. 678, 683 (D.D.C. 2015). And importantly, "standing alone," a

movant's "diligence in pursuing discovery" cannot "trump the three requirements outlined in *Convertino*." *Folliard*, 764 F.3d at 26.  Similarly, a movant may not use Rule 56(d) to "rehash[] arguments the court previously considered" but rejected.  *Ogunsula v. Staffing Now, Inc.*, 271 F. Supp. 3d 310, 314 (D.D.C. 2017) (finding Rule 56(d) movant "reviving" "previous discovery rulings that did not go his way" fails to satisfy Rule 56(d) burden), *aff'd*, 736 F. App'x 1 (D.C. Cir. 2018).

Under the third requirement, a Rule 56(d) movant must offer "supporting facts to justify the proposition that the discovery sought will produce the evidence required." *Folliard*, 880 F. Supp. 2d at 41 (citation omitted).  Thus, "conclusory allegations," "'mere speculation' of evidence not yet discovered," or the movant's "hope that additional discovery will create questions of fact" all fail to satisfy the movant's burden to show he is entitled to Rule 56(d) relief.  *Morales v. Humphrey*, 309 F.R.D. 44, 48 (D.D.C. 2015) (cleaned up).  Ultimately, "Rule 56(d) is not a means by which a party can delay the inevitable by making conclusory allegations regarding the need for additional discovery at the eleventh hour." *Mack v. Aspen of D.C., Inc.*, No. 15-cv-1973 (RJL), 2018 WL 564558, at *7 n.10 (D.D.C. Jan. 24, 2018).

## 2.    Thomas Is Not Entitled to Rule 56(d) Relief

In his motion, Thomas argues there are some seven types of information he needs before he can adequately oppose Moreland's summary-judgment motion.  He has failed to carry his burden for these requests, and so the Court will deny his Rule 56(d) motion and resolve Moreland's summary-judgment motion.

But before turning to the specific shortfalls of each request, the Court first notes an independent basis to deny the motion: its untimeliness.  Discovery began in April 2020 and lasted until November 2020.  *See* ECF No. 25.  The Court then permitted limited discovery to continue until March 17, 2021.  *See* ECF No. 68; Min. Order of Feb. 2, 2021.  Thomas thus had more than a "'reasonable opportunity' to complete discovery before responding to a summary judgment

motion." *See Khan*, 428 F.3d at 1087. Indeed, the point of Rule 56(d) is to prevent a defendant from "railroad[ing]" a plaintiff with a "premature motion for summary judgment." *Folliard*, 880 F. Supp. 2d at 41 (quoting *Celotex*, 477 U.S. at 326). That is not what happened here. Both parties had ample opportunity to conduct full discovery, and Moreland's first summary-judgment motion in December 2021—to which Thomas did not respond with a Rule 56(d) motion—provided him plenty of notice that he would have to marshal the record evidence to support his claims. In sum, his Rule 56(d) motion comes some twenty months after discovery concluded and over a year after Moreland's first summary-judgment motion. This lack of timeliness, on its own, would be grounds to deny the motion.[5]

### a.    Moreland's Interrogatory Responses

Thomas's first specific request is that Moreland should "fully and truthfully respond to [Thomas's] interrogatories." ECF No. 206 at 2 (capitalization altered). In his view, Moreland's responses to interrogatories were "replete with false and misleading statements," specifically about any defamatory statements Moreland may have made about Thomas wiretapping her phone, being a corporate mole, and having Asperger's syndrome. *Id.* But as already discussed, Thomas has not properly alleged that Moreland made any defamatory statements of this sort. Thus, any additional discovery into such defamatory statements by Moreland would not help Thomas "defeat [Moreland's] summary judgment motion" as to the statements at issue, and he is therefore not entitled

---

[5] *See, e.g.*, *Kakeh v. United Plan. Org., Inc.*, 537 F. Supp. 2d 65, 71 (D.D.C. 2008) (denying Rule 56(d) relief where "Plaintiff had more than ample opportunity to obtain the requested discovery from [a defense witness], but chose not to do so"); *Rowland v. Walker*, 245 F. Supp. 2d 136, 139 (D.D.C. 2003) ("It cannot possibly be the law that a party can forego seeking information by discovery and, when confronted by a motion for summary judgment, seek discovery it never sought in the first place to defeat the motion."), *aff'd*, No. 03-5082, 2003 WL 21803321 (D.C. Cir. July 31, 2003).

to that additional discovery. *See Est. of Parsons*, 715 F. Supp. 2d at 35; *see also Bolton*, 514 F. Supp. 3d at 165.

Thomas's request for "full[] and truthful[]" responses is beyond the purview of Rule 56(d) anyway. Beside his own say-so, Thomas offers no reason for his belief that Moreland has other more complete or truthful responses than those she already gave. *Morales*, 309 F.R.D. at 48 (The "plaintiff's hope that additional discovery will create questions of fact is improper use of Rule 56(d).") (citing *Graham v. Mukasey*, 608 F. Supp. 2d 50, 53 (D.D.C. 2009)). Thus, he has failed to show that the material he seeks is discoverable because he offers no "supporting facts to justify the proposition that the discovery sought will produce the evidence required." *Folliard*, 880 F. Supp. 2d at 41 (citation omitted).

### b.    "Highly Confidential" Material

Second, Thomas "requests the Court clarify that material labeled 'highly confidential' can be viewed by pro se parties"—in other words, by him. ECF No. 206 at 4 (capitalization altered). Thomas's request has some intuitive appeal, because, now that he represents himself, he seeks access to information that he believes relevant. Even so, Thomas's request is too little too late, and it would not help him survive summary judgment anyway.

In September 2020, the Court entered a protective order in this case, which provides that the parties may designate certain confidential documents as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL." ECF No. 37 ¶ 1(a). Under the order, documents designated as highly confidential by one party "shall not be disclosed to the opposing party" (i.e., to Moreland or Thomas), although opposing counsel may receive them. *See id.* ¶ 1(e). The Court entered the protective order because it was "satisfied" that it "would protect sensitive or proprietary information from unwarranted disclosure." Min. Order of Sept. 10, 2023 (quoting *Orion Power Midwest, L.P. v.*

*Am. Coal Sales Co.*, No. 2:5-cv-555, 2008 WL 4462301, at *1 (W.D. Pa. Sept. 30, 2008)).  The

Court's decision to enter the protective order has proved prescient many times.[6]

Thomas, now proceeding pro se, seeks material considered "highly confidential" that he

believes his attorneys possessed before they withdrew in February 2021.[7]  ECF No. 75 at 1.  But

when moving to withdraw, his attorneys represented that they would *not* "transmit [highly confi-

dential] documents or information absent further Order of this Court."  *Id.*  And still, Thomas

consented to the withdrawal, *id.*, and filed a notice of intent to proceed pro se.  ECF No. 76.  If

access to the highly confidential material Thomas now seeks is—as he now suggests—paramount

to his case, then he could have retained new counsel to receive , consistent with the protective

order.  But he did not.  To the contrary, he waited until the last possible moment to file a Rule

56(d) motion.  As discussed above, Rule 56(d) relief is not appropriate in such circumstances.

Moreover, even if this request were timely, the Court would not have granted it.  Federal

Rule of Civil Procedure 26(c), which Thomas does not invoke, governs protective orders, and

some courts "have applied a four factor test for determining when a protective order should be

---

[6] *See* Min. Order of January 21, 2021 (ordering Thomas to "show cause . . . why the Court should not hold him in civil contempt for violating this Court's Protective Order, including by providing any information he wishes about whether he disclosed the documents at issue to anyone unconnected to this litigation."); ECF No. 92 at 12, ECF No. 111 at 9 (declining to hold Thomas in civil contempt on show-cause order of January 21, 2021, only because of an "ambiguity" in the protective order, but otherwise clarifying that the protective order from then on applies "retroactively" to the documents Thomas had earlier disclosed); *see* Min. Order of June 14, 2022 (ordering Thomas to "show cause why he should not be held in contempt for violating the Protective Order by filing a complaint in the Superior Court of the District of Columbia in July 2021 that references and relies on information he admittedly first learned during discovery in this case").

[7] Although his former attorneys no doubt had access to highly confidential information, they had also moved (as Thomas now does) to change the designation of certain material *so that Thomas could have access to it*.  *See* ECF No. 206 at 5; ECF No. 52.  The Court denied that motion. Jan. 26, 2021 Hr'g Tr. 12:5–6, 15:24–16:6, 26:24–27:8; ECF No. 74; ECF No. 68.  Thomas's renewed request contemplates re-designating some of the same information subject to that denial. *See* ECF No. 206 at 5.

modified": "(1) the nature of the protective order; (2) the foreseeability of the modification; (3) the parties' reliance on the protective order; and (4) the presence of good cause for the modification." *Infineon Techs. AG v. Green Power Techs. Ltd.*, 247 F.R.D. 1, 2 (D.D.C. 2005). Thomas does not address these factors, but here the parties' reliance on the protective order throughout this litigation and the privacy interests protected by it weigh against modification. Min. Order of Sept. 10, 2020. The Court should also consider "the potential to cause harm to the affected party"—here, Moreland and HSUS. *See Laxalt v. McClatchy*, 809 F.2d 885, 890 (D.C. Cir. 1987). Against the backdrop of Thomas's record of "vexatious conduct" that "suggests an intent to harass," the potential for harm is great. ECF No. 182 at 14.

Above all, however, Thomas's pursuit of "highly confidential" material fails for another independent reason: it would not help him survive summary judgment. Thomas seeks two "highly confidential" sets of material. He first requests "HSUS's 30(b)(6) testimony and exhibits regarding other complainants who 'came forward'" with allegations against him. ECF No. 206 at 4–5. Perhaps some of that material could be relevant to the harm Thomas may have suffered because of the alleged defamation, if the material helped explain why he was terminated from HSUS. But as explained below, the Court resolves Moreland's motion for summary judgment on grounds that have nothing to do with any such harm: by finding that two of the statements do not even concern Thomas and that the other twelve are privileged. Second, Thomas seeks Moreland's deposition testimony about any personal relationship she may have had with Pacelle. ECF No. 206 at 5. The Court is familiar with that testimony, and it is not relevant to the Court's resolution of Moreland's summary-judgment motion. *See generally* ECF No. 74 at 24–27. Thus, because the Court's resolution of Moreland's summary-judgment "motion would not change even if [Thomas]

successfully discovered all the [highly confidential] information" he seeks, Thomas "has not shown why additional discovery is necessary." *See Bolton*, 514 F. Supp. 3d at 165.

### c.    Federal Rule of Civil Procedure 30(b)(6) Witness Material

Third, Thomas's Rule 56(d) motion requests the "material used to prepare HSUS' 30(b)(6) witness in response to [Thomas's] counsel's subpoena duces tecum." ECF No. 206 at 6–8 (capitalization altered). Most obviously, this request fails because Thomas has not outlined "the particular facts he intends to discover and why those facts are necessary to the litigation." *Convertino*, 684 F.3d at 99. Instead, he references "'nearly 2,000 pages' of documents." ECF No. 206 at 6. But beyond conjecture, he does not explain with specificity what information is in those documents and why he needs them. *See id.* at 7–8. Rule 56(d) does not reach such a "broad" and nonspecific category of information. *See Haynes*, 924 F.3d at 532.

Moreover, Thomas has already litigated this issue, to no avail. He moved for sanctions against HSUS for not providing a complete set of documents used to prepare its Rule 30(b)(6) witness, despite language in Thomas's subpoena. ECF No. 117 at 8–9. Along with sanctions, the Court considered whether Thomas was entitled to the withheld documents. ECF No. 161 at 9. But any request for them, the Court held, was "untimely because discovery closed more than nine months before he filed his Motion [for sanctions on August 9, 2021] and because he failed to explain his delay in seeking such an order." ECF No. 161 at 9. Thomas's resurrected request for the same material is even less timely now.

### d.    Moreland's Email Accounts

Fourth, Thomas seeks from HSUS "relevant emails from [Moreland's] work email account(s)." ECF No. 206 at 8–11 (capitalization altered). But Thomas already moved to compel "[a]ll documents concerning Thomas in HSUS' accounts, property and/or devices used by Moreland, including but not limited to all such documents from Moreland's work email(s) . . . ." ECF

No. 52 at 11.  And the Court already resolved that motion, denying Thomas's "blanket request for all documents related to Thomas" as an "undue burden on the Humane Society."  Jan. 26, 2021 Hr'g Tr. 18:22–24.  Rule 56(d) does not allow Thomas to renew this request.  *See Ogunsula*, 271 F. Supp. 3d at 314.  Moreover, the breadth of Thomas's request and the mere hope that it would reveal documents that could help him fail *Convertino*'s first and third requirements.  *Convertino*, 684 F.3d at 99–100; *Haynes*, 924 F.3d at 532; *Morales*, 309 F.R.D. at 48.

### e.    Privileged Report into Retaliation Claims Against Then-CEO

Fifth, Thomas spills much ink requesting that HSUS "produce the unprivileged report into [Pacelle] and his 'alleged girlfriend' retaliating against employees who complained about their relationship."  ECF No. 206 at 11 (capitalization altered).  At risk of playing a broken record, Thomas has already litigated—and the Court has already denied—this request.  Well over two years ago, Thomas moved to compel HSUS to produce "[a]ll internal and/or consultants' reports in HSUS' possession that address the question of whether Pacelle was, as Thomas reported to Moreland, a sexist person."  ECF No. 52 at 12.  The Court denied that request because, "to the extent that Thomas seeks the report prepared by outside counsel, that report is protected by attorney-client privilege and is not discoverable."  Jan. 26, 2021 Hr'g Tr. 19:23–25; ECF No. 206 at 15 (Thomas acknowledging same).  "[E]ven if it were not privileged," the Court held, "any argument as to this report's relevance to a claim or defense in this case is unclear at best" because Thomas was terminated before the report and neither Thomas nor Moreland ever saw it such that it could have affected their state of mind or motive during the relevant time.  Jan. 26, 2021 Hr'g Tr. at 20:1–9.  Nothing has changed in the interim, and so Thomas's recycled request, this time under Rule 56(d), is not proper.

### f.    Moreland's iCloud Backup

Sixth, Thomas seeks evidence from Moreland's iCloud backup.  ECF No. 206 at 16.  But Thomas has not clearly established that the evidence he seeks is discoverable.  Moreland represents that she has "conducted a reasonable search of her documents and information, and has produced all non-privileged, responsive documents and information in her possession."  ECF No. 207-2 at 15.  The Court has also already resolved Thomas's motion for sanctions related to Moreland's alleged spoliation of evidence on her phone after it was imaged by HSUS in September 2017.  ECF No. 182 at 11.  The Court denied Thomas's motion because in its view Moreland had not "failed to take 'reasonable steps' to preserve any post-imaging [electronically stored information ("ESI")] relevant to this case."  *Id.*  More germane to the instant request, the Court also noted that "the record suggests that no relevant ESI would have been created on the phone after the imaging."  *Id.* at 11 n.7.  To obtain Rule 56(d) relief, Thomas cannot reassert this already decided issue, as he attempts.  *See Ogunsula*, 271 F. Supp. 3d at 314.  But even if he could, consistent with the Court's earlier view, and as Thomas himself now acknowledges, "Ms. Moreland testified that she did not believe she had any communications with the Plaintiff after her phone was imaged by HSUS, and that she did not use the phone after October 2017 for any communications that would have been responsive to the discovery requests in this action."  ECF No. 114-2 at 2–3; *see* ECF No. 206 at 17 (quoting same).  Disregarding, as the Court must, his "mere speculation" and many "conclusory allegation[s]," Thomas has not explained the basis for his belief that any relevant material exists beyond what Moreland has already provided.  *Morales*, 309 F.R.D. at 48; *Bolton*, 514 F. Supp. 3d at 165.[8]

---

[8] Relatedly, Thomas requests that the Court order Moreland "pay the legal expenses he reasonably incurred as a result of the destruction of some of Defendant's discoverable evidence."  Thomas cites no authority suggesting that this request is proper under Rule 56(d) nor any other

### g.    Request for Admissions

Seventh, Thomas requests that Moreland "admit or deny under penalty of perjury the ver-

ifiable facts that Plaintiff did not stalk Defendant; he did not wiretap or otherwise intercept De-

fendant's phone calls; he was not a corporate 'mole'; and he does not have Asperger's syndrome

or a form of it." ECF No. 206 at 19.  To that end, he attaches as an exhibit to his Rule 56(d) motion

thirty-one requests for admission.  ECF No. 206-3.  He does not explain why he did not attempt to

seek these admissions earlier.  Thus, these requests are not appropriate now.  That aside, his re-

quests for admission largely attempt to discover information about purportedly defamatory state-

ments that Thomas has not properly alleged.  Thus, even if the requested admissions were timely,

they are irrelevant to the defamation claims before the Court.

*　　*　　*

Unable to support his array of Rule 56(d) requests, Thomas's motion is really just an at-

tempt "to delay the inevitable by making conclusory allegations regarding the need for additional

discovery at the eleventh hour."  *Mack*, 2018 WL 564558, at *7 n.10.  That makes a hash of

Rule 56(d), and so the Court will deny Thomas's Rule 56(d) motion.

### C.    Moreland's Motion for Summary Judgment

On to Moreland's summary-judgment motion, and whether there is any genuine dispute of

material fact about whether the fourteen statements at issue constitute defamation.  To prove def-

amation, Thomas "must show (1) that the defendant made a false and defamatory statement con-

cerning the plaintiff; (2) that the defendant published the statement without privilege to a third

party; (3) that the defendant's fault in publishing the statement amounted to at least negligence;

---

authority.  Nor has Thomas shown why he is entitled to such fees for his efforts collecting infor-
mation that would not be relevant to this litigation.  Thus, the request will be denied.  *See Folliard*,
764 F.3d at 26 (vesting trial courts with wide discretion on discovery disputes).

and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006) (quoting *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001)).  For the following reasons, the Court finds that Statements 13–14 do not concern Thomas as required under the first element, and that Thomas has failed to point to sufficient evidence that could prove that Statements 1–12 are unprivileged under the second element.  Thus, the Court will grant summary judgment for Moreland on all the statements at issue.

### 1.    Legal Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A fact is "material" if a dispute over it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

To survive summary judgment, Thomas, as the nonmoving party, must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation omitted).  After "adequate time for discovery," the Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  While the nonmoving party "is entitled to all justifiable inferences," "legal conclusions 'cloaked' as facts are not sufficient to create a genuine issue of material fact."

*United States v. BCCI Holdings (Luxembourg), S.A.*, 977 F. Supp. 1, 6 (D.D.C. 1997) (citation omitted), *aff'd*, 159 F.3d 637 (D.C. Cir. 1998).  In the end, if the evidence favoring the nonmovant, even taking all inferences in his favor, "is merely colorable, or is not significantly probative," or "is 'so one-sided'" that no reasonable jury could find for the nonmovant, then summary judgment should be granted.  *Anderson*, 477 U.S. at 249–50, 252 (citation omitted).

### 2.    Purported Evidentiary and Factual Disputes

Before considering the statements at issue, the Court notes that throughout the parties' 225-paragraph joint statement of facts, the parties vigorously dispute various statements of fact and the admissibility of certain evidence.  *See generally* ECF No. 209-3.  The Court pauses here to resolve two points that bear on the Court's analysis of Moreland's summary-judgment motion.  *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

First, Thomas tries to cast aside "HSUS' 30(b)(6) testimony from Alexa Herndon" as "inadmissible hearsay."  ECF No. 203 at 19–21.  Thomas is wrong that the Court may not consider it.

In support of his blanket insistence that Herndon's testimony is "inadmissible hearsay," Thomas seems to argue that she is not a proper Rule 30(b)(6) witness because she was hired by HSUS years after the events at issue.  ECF No. 203 at 19–21.  This is not the first time Thomas has raised—and the Court has rejected—such an argument.  *See* ECF No. 117 at 8–9; ECF No. 161 at 7–8.  Thomas remains wrong.  Rule 30(b)(6) allows an organization subpoenaed for a deposition to designate officers to testify on its behalf.  Fed. R. Civ. P. 30(6)(6).  A designated 30(b)(6) deponent then "must testify about information known or reasonably available *to the organization*."  *Id.* (emphasis added).  Courts have likewise clarified that a deponent must be prepared to "testify on matters . . . 'reasonably known by the responding entity'" in addition to those "within his or her

personal knowledge." *Banks v. Off. of the Senate Sergeant-At-Arms*, 241 F.R.D. 370, 373 (D.D.C. 2007); *see also, e.g.*, *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 516 (5th Cir. 2012) (considering affidavit statements of Rule 30(b)(6) witness who, the plaintiff argued, did "not have the personal knowledge to make the statements contained in those paragraphs," because a "corporate designee does not testify as to his personal knowledge or perceptions"; "[r]ather, he testifies vicariously, for the corporation, as to its knowledge and perceptions.") (cleaned up).  Thus, as the Court has already told Thomas, the rules "precisely . . . allow" an organization to designate as a Rule 30(b)(6) deponent "someone who 'never witnessed' the events at issue in the case."  ECF No. 161 at 7–8 (collecting authority).

Thus, even though she was hired after the events giving rise to this litigation, Herndon was a proper Rule 30(b)(6) deponent, and Thomas cannot dismiss her testimony out of hand.  Herndon testified about topics within her personal knowledge—like HSUS's general HR function—as well those within HSUS's knowledge—like its 2017 investigation into Thomas.  *See generally* ECF Nos. 198-6, 209-5.  And Herndon's testimony makes clear when she was testifying *on behalf of HSUS*.  *See, e.g.*, ECF No. 198-6 at 10–11, 23, 29 (Herndon answering questions "to the organization's knowledge," "based on HSUS' corporate knowledge," "[t]o the best of HSUS' knowledge," and "to the best of [her] corporate knowledge").  Rule 30(b)(6) permits such testimony.  *See* ECF No. 117 at 8–9; *Banks*, 241 F.R.D. at 373; Fed. R. Civ. P. 30(b)(6).  And "in deciding a summary judgment motion," the "Court may properly consider deposition testimony," including Rule 30(b)(6) testimony.  *See Asi v. Info. Mgmt. Grp., Inc.*, No. CV SAG-18-3161, 2019 WL 7370325, at *1 n.1 (D. Md. Dec. 31, 2019) (citing Fed. R. Civ. P. 56(c)(1)(A), (c)(2)), *aff'd*,

No. 20-1101, 2022 WL 3700099 (4th Cir. Aug. 26, 2022).[9]  Challenging that conclusion, Thomas

cites *Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, a case that concerned the "admissibility

of testimonial evidence at trial" in resolving a motion in limine, not Rule 30(b)(6).  *See* 72 F. Supp.

3d 131, 146 (D.D.C. 2014); ECF No. 203 at 20.  But "if a rule 30(b)(6) witness is made available

at trial," he can, and indeed "should[,] be allowed to testify as to matters within corporate

knowledge to which he testified in deposition."  *See Brazos River Auth. v. GE Ionics, Inc.*, 469

F.3d 416, 434 (5th Cir. 2006).  Thus, the Court may properly rely on Herndon's testimony in

support of Moreland's motion for summary judgment.

The Court also notes that Thomas's wholesale rejection of Herndon's testimony also con-

flicts with his approach elsewhere.  Thomas denies countless statements of fact asserted by Mo-

reland because "Ms. Herndon's hearsay is inadmissible."  *See*, *e.g.*, ECF No. 209-3 ¶¶ 23, 37, 43,

76, 78, 86–104, 106.  Yet, in the same breath, Thomas himself relies on Herndon's deposition

testimony to support both his own statements of fact and his refutations of Moreland's.  *See, e.g.*,

*id.* ¶¶ 37, 39, 40, 42, 49, 59, 67, 72, 82, 92, 96–104, 109, 111–14, 124–25, 128, 145–47, 159, 163,

172, 173, 186, 202, 204, 207–08; *see also* ECF No. 203 at 3, 25 n.29 (Thomas's opposition citing

Herndon's testimony).  Most conspicuously, at times, Thomas even directly quotes or cites the

_____

[9] Courts may consider the testimony of a Rule 30(b)(6) witnesses at summary judgment
even if it would otherwise be inadmissible hearsay.  *See, e.g.*, *Lossia v. Flagstar Bancorp, Inc.*,
895 F.3d 423, 430 (6th Cir. 2018) ("[E]ven if the relevant portion of [the Rule 30(b)(6) witness's]
deposition testimony included hearsay statements that would themselves be inadmissible in their
current form, evidence considered at the summary judgment stage need not be 'in a form that
would be admissible at trial,' as long as the evidence could ultimately be presented in an admissible
form.") (quoting *Celotex*, 477 U.S. at 324).

very testimony that he elsewhere denies as inadmissible.[10]  Thomas cannot have his cake and eat it too.

Second, trying to dispute several of Moreland's statements of fact that rely on Moreland's testimony, Thomas repeatedly admits that "Moreland testified to [a particular] effect" but argues that "[t]here is no evidence supporting [that] other than Defendant's assertion."  ECF No. 209-3 ¶¶ 32, 38–40, 42, 49, 56–59, 66, 68–69.  Even if Thomas is correct that Moreland's testimony is the only evidence of a given fact, that does not by itself call it into question.  Moreland may of course properly rely on her deposition testimony at the summary-judgment stage.  *See Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016) ("It is . . . beyond question as a general proposition that parties, like other fact witnesses, are legally competent to give material testimony."); Fed. R. Civ. P. 56(c)(1)(A).  For the Court to find some genuine dispute of material fact as to statements of fact that derive from Moreland's testimony, Thomas must adduce "concrete" and "affirmative" evidence sufficient to give rise to a genuine dispute of material fact.[11]  But when, as here, "challenges to witness' credibility are all that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper."  *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).  Thomas's refrain that Moreland relies

---

[10] *Compare* ECF No. 209-3 ¶ 104 (denying as inadmissible "HSUS 30(b)(6) (Herndon Oct. 19, 2020) 83:2–85:20"), *with id.* ¶ 159 (quoting directly from "Herndon [10-19-20] Dep. 83:16-84:1" and "Herndon [10-19-20] Dep. 84:7-10"); *compare also id.* ¶ 93 (denying as inadmissible "HSUS 30(b)(6) (Herndon Oct. 22, 2020) 154:10–155:18"), *with id.* ¶ 67 (citing "Herndon 10-22-20 Dep. 154:13-155:2, 155:12-18").

[11] *Anderson*, 477 U.S. at 247–48; *see also Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017) (The nonmovant "must identify specific facts in the record to demonstrate the existence of a genuine issue"); *Staton v. Children's Nat'l Med. Ctr.*, No. 20-cv-03328 (DLF), 2022 WL 4446396, at *3 n.2 (D.D.C. Sept. 23, 2022) (rejecting the plaintiff's disputes of "factual characterizations" because "she identifies no evidence in the record that establishes a genuine issue of disputed fact").

on her own testimony to support some statements of fact is therefore of no consequence and does not help him create a *genuine* dispute of material fact.

The Court proceeds to consider Moreland's motion for summary judgment consistent with—and without repeating—these two overarching points.

### 3.     Statements 13 and 14 Do Not Concern Thomas

Moreland is entitled to summary judgment as to Statements 13 and 14 because these statements do not concern Thomas and thus cannot be defamatory as to him.  Recall that, to prove defamation, Thomas must show that an allegedly defamatory statement "concern[s]" him.  *Mastro*, 447 F.3d at 858.  In practice, this means he must prove that "the statement referred to [him] and that a person hearing or reading the statement reasonably could have interpreted it as such."  *Luhn v. Scott*, No. 19-cv-1180 (DLF), 2019 WL 5810309, at *4 (D.D.C. Nov. 7, 2019) *aff'd*, 843 F. App'x 326 (D.C. Cir. 2021) (citation omitted).  Put another way, a statement must "describe . . . [his] activities and behavior."  *See, e.g.*, *Coles v. Washington Free Wkly., Inc.*, 881 F. Supp. 26, 32–33 (D.D.C. 1995) (defendant newspaper's statements that the plaintiff lawyer's client "occasionally interjected bits of his own commentary, unbidden by [the] lawyer" at a hearing and that the client performed his own legal research were "not 'of and concerning' [p]laintiff" because "[t]he statements describe [the client's] activities and behavior, not [the plaintiff lawyer's] activities and behavior") (emphasis omitted), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996).

Statements 13 and 14 do not fit the bill.  Statement 13, ultimately, refers to the statement Moreland made to Norbert that she "didn't want to be alone [at dinner] so [Pacelle] said he and Mike could go and be in the restaurant.  [Moreland] agreed and told [Pacelle] not to leave her."

ECF No. 142-17 at 3.[12]  The statement concerns what Pacelle and Moreland said and how Moreland felt.  This statement does not "refer" to Thomas.  *See Luhn*, 2019 WL 5810309, at *4.  Nor does it contain any description of Thomas's "activities and behavior."  *See Coles*, 881 F. Supp. at 32–33.  Unsurprisingly, when Thomas asked HSUS to have "Moreland's accusations set out in writing," Little did not even include Statement 13 in her email to Thomas listing Statements 1–12.  *See* ECF No. 209-3 ¶¶ 83–84*;* ECF No. 198-35 at 2; *see generally* ECF No. 198-16.  Thus, Statement 13 does not concern Thomas such that he can base an any actionable claim of defamation against Moreland on it.

The same is true of Statement 14.  In that statement, Moreland (as alleged by Thomas in the amended complaint) "falsely claimed that she could not reproduce [her text messages with Thomas] due to 'technical difficulties.'"  Am. Compl. ¶ 93; ECF No. 198-24 at 6.  Moreland's statement that she had technical difficulties with *her* text messages, true or not, has nothing to do with Thomas or his conduct.  *Luhn*, 2019 WL 5810309, at *4; *Coles*, 881 F. Supp. at 32–33.  Thus, it cannot serve as the basis for a defamation claim.

---

[12]  In Moreland's telling, Statement 13 derives from a letter from Grossenbacher to Thomas's attorney, in which *Grossenbacher* said, "Moreland ultimately went to Café Deluxe with [Thomas] for a quick bit to eat and only then with the knowledge that two other HSUS employees would be present at all times at another table in the restaurant."  ECF No. 198-22.  But Grossenbacher's statement about Moreland cannot be the basis for a defamation claim against Moreland.  *Mastro*, 447 F.3d at 858 (A plaintiff "must show (1) that *the defendant* made a . . . statement.").  Thomas, in his interrogatory, relatedly characterizes one allegedly defamatory statement as "Moreland's allegation that . . . there were two secret, unnamed witnesses from the organization watching them have dinner."  ECF No. 198-24 at 6.  The only available proof of any such statement *by Moreland* is found in Norbert's notes of her September 17, 2017, meeting with Moreland, which say: "[Moreland] didn't want to be alone so [Pacelle] said he and Mike [Markarian, then-COO] could go and be in the restaurant.  [Moreland] agreed and told [Pacelle] not to leave her."  ECF No. 142-17 at 3; ECF No. 209-3 ¶ 101.  The Court therefore understands Statement 13 to originate from Moreland's conversation with Norbert.

Thomas's defamation claim relating to Statement 14 is separately doomed because he does not identify any admissible evidence that Moreland even made it. He cites only his complaint. ECF No. 203 at 20 (quoting Am. Compl. ¶ 93). He argues that Herndon's deposition testimony is proof that Moreland made Statement 14. *Id.* (citing ECF No. 209-3 ¶ 207). But in the cited testimony, the specific words "technical difficulties" come from Herndon and the deposing attorney—not Moreland. ECF No. 209-6. With no evidence that Moreland ever made Statement 14, a defamation claim based on it cannot survive summary judgment. *See Celotex*, 477 U.S. at 322–23 ("[T]here can be 'no genuine issue as to any material fact'" when a nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

### 4.    Statements 1–12 Are Protected by the Common-Interest Privilege

Even assuming Statements 1–12 are defamatory,[13] Moreland invokes the so-called "common interest" privilege as a defense to Thomas's defamation allegations on Statements 1–12. "The

---

[13] To be defamatory, statements must be false. *Mastro*, 447 F.3d at 858. "Truth is an absolute defense to defamation claims." *Benic v. Reuters Am., Inc.*, 357 F. Supp. 2d 216, 221 (D.D.C. 2004). "Truth" in this context means a statement is "substantially true," that is that "the 'gist' of the statement is true or that the statement is substantially true, as it would be understood by its intended audience." *Id.* (citations omitted). As Moreland explains, pointing to record evidence, there is good reason to think Statements 1–12 *are* substantially true and thus not defamatory for that reason. *See* ECF No. 198-2 at 29–37. Consider Statement 10: Moreland's statement that Thomas "texted her multiple times asking her to go for a walk." No. 198-16 at 2. His texts reveal he did just that. *See, e.g.*, ECF No. 198-18 at 14 (Thomas: "This time next Sunday would be a perfect time for a walk and talk with Dre if you're in town! The magic hour[.]"), 24 (Thomas: "How do you and Dre feel about going for a walk tomorrow?"). Moreland has pointed to evidence showing that Thomas cannot prove the falsity of the other statements, as well. But the Court need not reach this element of Thomas's defamation claims to conclude that Moreland is entitled to summary judgment on them.

common interest privilege protects otherwise defamatory statements made '(1) . . . in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest.'" *Mastro*, 447 F.3d at 858 (alteration in original) (quoting *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990)). "Whether the . . . 'common interest' privilege[] appl[ies] is a question of law." *Stark v. Zeta Phi Beta Sorority, Inc.*, 587 F. Supp. 2d 170, 176 (D.D.C. 2008).

"Two circumstances foreclose asserting the privilege: first, excessive publication . . . and, second, publication with malice." *Mastro*, 447 F.3d at 858. "[T]he defendant bears the burden of proving the elements of the common interest privilege," but if satisfied, "the burden of defeating the privilege by showing excessive publication or publication with malice lies with the plaintiff." *Id.* If the plaintiff cannot meet his high burden to show either "malice or excessive publication," then the privilege will be "an absolute defense to an action for defamation." *Alade v. Borg-Warner Protective Servs. Corp.*, 28 F. Supp. 2d 655, 656 (D.D.C. 1998).

As explained below, the privilege applies to Statements 1–12 and Thomas has failed to meet his burden to defeat that privilege. Moreland is therefore entitled to summary judgment on defamation claims arising from these statements.[14]

### a.    The Common-Interest Privilege Applies to Statements 1–12

The common-interest privilege protects Statements 1–12—those reflected in Little's email to Thomas that purport to document Moreland's conversation with Norbert. ECF No. 198-16 at 2.

---

[14] Because the Court ultimately concludes that Thomas has failed to meet the second element of defamation for Statements 1–12—that Moreland made them without privilege—the Court need not consider the other elements. *Mastro*, 447 F.3d at 859 (affirming summary judgment for defendants on defamation claims based only on the plaintiff's failure "to demonstrate a necessary element of defamation" by not defeating the common-interest privilege).

The Court begins with the second and third elements of the common-interest privilege, which ask whether Moreland's statements concerned "a subject in which [she] has an interest, or in reference to which [s]he has, or honestly believes [s]he has, a duty to a person having a corresponding interest or duty," and whether Norbert, to whom she made the statements, had "a corresponding interest.'" *Mastro*, 447 F.3d at 858. Not surprisingly, courts have held that "[c]ommunications by . . . co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the privilege." *Albert v. Loksen*, 239 F.3d 256, 272 (2d Cir. 2001).[15]

Moreland asserts that in speaking to Norbert she "spoke freely to her workplace's HR department about a variety of concerns that she had with Thomas's workplace conduct, so that the organization could take whatever steps it deemed necessary to promote 'the smooth and efficient operation' of its workplace." ECF No. 198-2 at 17. Her interest in reporting HSUS employees' potential misconduct is memorialized in HSUS's Employee Handbook, which states: "HSUS has an open door policy and suggests that employees share their questions, concerns, suggestions, or complaints with someone who can address them properly." ECF No. 209-3 ¶ 18. The Handbook even "requires" employees to report "serious concerns regarding . . . potential violations of internal policies that could cause harm to an employee, volunteer or other person or to the organization

---

[15] *See also Roland v. d'Arazien*, 685 F.2d 653, 655 (D.C. Cir. 1982) (finding a "common interest . . . in the smooth and efficient operation of [defendant's] office"); *Ruf v. Am. Broad. Cos., Inc.*, No. 97-cv-1427 (TFH), 2000 WL 35433488, at *6 (D.D.C. Feb. 22, 2000) ("[M]anagement and union representatives shared a common interest under the collective bargaining agreement in properly investigating and resolving allegations of misconduct by union members in the workplace, and the Court finds that this communication was made for that purpose."); *Elliott v. Healthcare Corp.*, 629 A.2d 6, 9 (D.C. 1993) (finding that the plaintiff and his supervisors had a common interest in having conversation about the plaintiff's job performance).

itself." *Id.* ¶ 19. And Norbert, an HR representative, obviously has an interest in both receiving, and addressing, such reports. *Id.* ¶ 54.

Statements 1–12 fall well within Moreland and Norbert's common interest to uncover and address employees' concerns about coworkers' conduct. In those statements, Moreland conveyed that she "fe[lt] very uncomfortable and intimidated" by her colleague, Thomas. ECF No. 198-16 at 2. And she outlined Thomas's specific conduct that made her feel that way, for instance that Thomas "followed her around the office," "became upset with her" when "she could only stay [at dinner] for 90 minutes," and asked about an intimate detail of her friend's life that she "had not shared with [Thomas] or anyone else at the HSUS." *Id.* Statements 1–12 thus are within Moreland's asserted interest in reporting workplace misconduct and Norbert's common interest in addressing it.

Returning to the first element of the common-interest privilege, the Court also finds that Moreland acted in good faith. In determining whether the privilege applies, "[i]n general, courts have not analyzed what the invoking party must show to demonstrate good faith." *Burns v. Levy*, No. 13-cv-898 (CKK), 2019 WL 6465142, at *17 (D.D.C. Dec. 2, 2019). Courts mostly consider the issue of a defendant's good faith when "examin[ing] whether *plaintiffs* have met the demanding standard for showing that the defendants acted with malice," to defeat the privilege. *Id.* (emphasis added). Thus, courts explain that at the outset the "party invoking the privilege must make a facial showing of good faith," giving rise to a presumption that the defendants "acted in good faith that plaintiff must overcome." *Id.* (citing cases) When courts do assess good faith separate from malice, they appear to focus on whether the speaker had good faith *with respect to* the common

interest.[16]  Indeed, "the same evidence" establishing the defendants' common interest can be sufficient to "support[] that the [defendants] . . . acted in good faith."  *Id*.  Courts have also held that "the common interest privilege 'exists only if the publisher believes, with reasonable grounds, that the statement is true.'"  *Burns v. Levy*, 873 F.3d 289, 295 (D.C. Cir. 2017) (quoting *Moss*, 580 A.2d at 1025).

In making Statements 1–12, the record evidence overwhelmingly shows that Moreland acted in good faith, both because her statements conveyed her genuine discomfort about Thomas's conduct and because they were made in connection with HSUS's investigation into that conduct. Her good faith is strengthened because, according to Moreland, she did not request the meeting with Norbert.  ECF No. 209-3 ¶¶ 54–56.  Instead, Norbert prompted the conversation with Moreland in her "official capacity as a member of the HR department."  *Id.* ¶ 55.  And, Moreland testified, Norbert told Moreland that she wanted to speak with Moreland "about . . . Mr. Thomas, and [she] underst[ood] [Moreland] may have information."  ECF No. 198-5 at 49–50.  Only then, after being prompted by Norbert's inquiry, did Moreland offer Statements 1–12.  Moreover, the statements were consistent with HSUS's Handbook, which encourages "that employees share their questions, concerns, suggestions, or complaints with someone who can address them properly," like Norbert.  ECF No 209-3 ¶ 18.  And Little later confirmed that "[i]f *true*," Thomas's behavior

---

[16] *See, e.g.*, *Roland*, 685 F.2d at 655 (after finding the common interest between the defendant and listener, holding the privilege applied because defendant's "communication was in furtherance of the interest shared by him and [the listener]."); *Alade*, 28 F. Supp. 2d at 657 (finding that, when the defendants made the allegedly defamatory statements, they "were performing in good faith what they reasonably perceived to be their duty to enforce their employer's sexual harassment policy"); *Columbia First Bank v. Ferguson*, 665 A.2d 650, 655 (D.C. 1995) ("In making her reports to law enforcement authorities, [the defendant bank's security officer] was acting consistently with her training and was 'performing in good faith what [she] reasonably perceived to be [her] assigned duty, an activity protected by qualified privilege.'") (citation omitted).

as recounted by Moreland "would violate The HSUS's Policy Against Sexual and Other Types of Harassment," further underscoring the propriety of Moreland elevating her concerns. *See* ECF No. 198-16 at 3. The record also reflects that Moreland had reasonable grounds to believe her statements were true: her firsthand experience observing, texting, and interacting with Thomas. *See, e.g.,* ECF No. 198-2 at 29–37. For these reasons, the Court finds that Moreland has made "a facial showing of good faith," and coupled with her and Norbert's common interest, the common-interest privilege applies to Statements 1–12. *See Burns*, 2019 WL 6465142, at *17.

Attempting to bypass analysis of the privilege altogether, Thomas asserts the privilege is "not relevant" because Moreland's statements constitute defamation per se. ECF No. 203 at 2–3. That argument misses the point. The second element of defamation that Thomas must prove is that "the defendant published the statement *without privilege* to a third party." *Mastro*, 447 F.3d at 858 (citation omitted) (emphasis added). And, unless defeated, the common-interest privilege is "an absolute defense to an action for defamation." *Alade*, 28 F. Supp. 2d at 656. Thomas's argument that the alleged statements amount to defamation per se speaks to only the fourth element of defamation—"either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Mastro*, 447 F.3d at 858. Nothing about this argument helps him meet his burden on the second element.

### b.    Thomas Has Failed to Carry His Heavy Burden to Defeat the Common-Interest Privilege

Because the Court finds that the common-interest privilege applies to Statements 1–12, the burden shifts to Thomas to defeat that privilege. *See Mastro*, 447 F.3d at 858. "District of Columbia law makes it very difficult for a plaintiff to overcome a qualified privilege." *Novecon Ltd. v. Bulgarian-Am. Enter. Fund*, 190 F.3d 556, 567 (D.C. Cir. 1999). To do so, a plaintiff must show either "excessive publication" or "express malice." *See Moss*, 580 A.2d at 1024. Thomas

tries to wave away the privilege as "not relevant," and he makes almost no attempt to show either excessive-publication or malice. ECF No. 203 at 2. But even reading his opposition liberally, he provides no reason why the privilege is overcome for either of those reasons.

### i.    Statements 1–12 Were Not Excessively Published

To begin, there is no evidence that the statements were excessively published such that the privilege is overcome. Excessive publication is "defined as 'publication to those with no common interest in the information communicated, or publication not reasonably calculated to protect or further the interest.'" *Mastro*, 447 F.3d at 858 (quoting *Moss*, 580 A.2d at 1024). But Moreland communicated Statements 1–12 only to Norbert. *See* ECF No. 198-5 at 49; ECF No. 198-17 at 2; ECF No. 209-3 ¶ 54. Thomas argues—without reference to any specific statement or even a single citation to the record—that the "HR report itself documents [Moreland's] history of defaming Plaintiff to more than a dozen coworkers." ECF No. 203 at 18. At least as it relates to the statements alleged as defamatory in the amended complaint, the HR report reveals no such "history." *See* ECF Nos. 198-16, 198-17. But even had Moreland expressed similar concerns to a "dozen coworkers," such publication to a self-contained group of HSUS employees who share in the common interest of reporting workplace misconduct would still not rise to the level of *excessive* publication.[17] Thus, Thomas fails to meet his "very difficult" burden to prove excessive publication to defeat the common-interest privilege.

---

[17] *See, e.g.*, *Novecon*, 190 F.3d at 566 n.5, 570 (holding that the defendant's "statements to [not] have been excessively published" even when they were mailed to "several hundred addressees"); *Wood v. Am. Fed'n of Gov't Emps.*, 316 F. Supp. 3d 475, 483 (D.D.C. 2018) (finding email sent to only a "small group of union officers, members and staff" was "not excessively published"), *aff'd*, No. 18-7124, 2019 WL 668337 (D.C. Cir. Feb. 12, 2019); *Armenian Assembly of Am., Inc. v. Cafesjian*, 692 F. Supp. 2d 20, 51 (D.D.C. 2010) (granting summary judgment to speaker when the party alleging defamation "failed to show that any [persons who lacked a common interest] ever learned of the allegedly defamatory statements, and even that alone is insufficient evidence of excessive publication"), *aff'd*, 758 F.3d 265 (D.C. Cir. 2014); *Howard Univ. v. Wilkins*, 22 A.3d

### ii.    Moreland Did Not Act with Malice in Reporting Her Concerns to Norbert

Thomas has also failed to point to sufficient evidence that Moreland acted with malice that would overcome the privilege when she made Statements 1–12.  Where, as here, "the court determines that the common interest privilege is applicable, the defendant will be presumed to have been actuated by pure motives in its publication, and in order to rebut this presumption, express malice or malice in fact must be shown by the plaintiff."  *Wood*, 316 F. Supp. 3d at 482 (cleaned up).  Malice "within the context of the common interest privilege, is 'the equivalent of bad faith.'" *Mastro*, 447 F.3d at 858 (quoting *Moss*, 580 A.2d at 1025); *Novecon*, 190 F.3d at 566–69 (likening malice to "evil motive") (citation omitted).  It "is the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will."  *Wood*, 316 F. Supp. 3d at 483–84 (quoting *Payne v. Clark*, 25 A.3d 918, 925 (D.C. 2011)).  A defendant does not lose protection of the privilege if she was "inspired in part by resentment or indignation," so "long as the communication is otherwise justified."  *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 290–91 (D.C. 1977); *see also Mattiaccio v. DHA Grp., Inc.*, 87 F. Supp. 3d 169, 185 (D.D.C. 2015) ("[E]ven a showing of ill will toward the plaintiff will not forfeit the privilege so long as the *primary* purpose is to further the interest which is entitled to protection.") (cleaned up).

A court may determine "that insufficient evidence has been presented to raise such an issue" of malice.  *Alfred*, 374 A.2d at 290.  And plaintiff "must make a substantial proffer of evidence of malice in order to meet" his burden to prove malice.  *Armenian*, 692 F. Supp. 2d at 49.  "There

774, 787 (D.C. 2011) (affirming summary judgment for the defendant employer when the defendant "reasonably communicated its [alleged defamatory] statement [accusing the plaintiff of stealing grant funds] only to its employees who had some responsibility for grant funds or supervision of [the plaintiff]," and thus enjoyed protection of the common-interest privilege).

must be more than speculation and innuendo." *Alfred*, 374 A.2d at 290. And "unless the statement itself is 'so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the defendant was actuated by express malice,' malice must be proven by extrinsic evidence." *Novecon*, 190 F.3d at 567 (internal quotation marks omitted) (quoting *Moss*, 580 A.2d at 1024). "Mere vehemence, even exaggerated statements will not as a matter of law destroy the privilege or necessarily present a question of fact." *Washburn v. Lavoie*, 437 F.3d 84, 91 (D.C. Cir. 2006) (cleaned up). In the end, if "the language of the communication and the circumstances attending its publication by the defendants are as consistent with the non-existence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant." *Mattiaccio*, 87 F. Supp. 3d at 185 (citation omitted). Thus, courts regularly resolve the issue of malice on summary judgment.[18]

Because the Court has already concluded that common-interest privilege applies to Statements 1–12, Moreland is presumed to have been "actuated by pure motives in [their] publication." *Wood*, 316 F. Supp. 3d at 482. As a result, Thomas bears the "very difficult" burden to prove express malice. *Novecon*, 190 F.3d at 567. He has failed to do so.

To begin, Statements 1–12 are not, on their own, "so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the defendant was actuated by express malice." *Novecon*, 190 F.3d at 567. Moreland's statements document her personal interactions with Thomas that she said concerned her. Many of the statements are fairly mundane, like

---

[18] *See Gregorio v. Hoover*, No. 16-cv-782 (EGS/GMH), 2019 WL 13280765, at *18 (D.D.C. Feb. 8, 2019) (granting defendants summary judgment because plaintiff "point[ed] to no extrinsic evidence of malice and fail[ed] to argue that the circumstances surrounding the production and publication of the letter admit of no other interpretation than that Defendants were motivated by malice"); *Wood*, 316 F. Supp. 3d at 484 (similar); *Mattiaccio*, 87 F. Supp. 3d at 185 (similar).

Statements 5, 6, and 8: those asserting that Thomas "asked her why she was in the hospital," "repeatedly asked if [he] could drive her home," and "asked if [he] could bring food to her house and asked who was looking after her."  ECF No. 198-16 at 2.  In other statements, like Statements 1 and 2, Moreland goes further to express that Thomas's conduct "made her feel very uncomfortable and intimidated" and that he had asked more probing questions, including whether "she had slept with [Pacelle]."  *Id.*  But these more "exaggerated statements" alone cannot defeat the privilege. *Washburn*, 437 F.3d at 91.  At worse, the statements together connote harassment of some form by Thomas.  So construed, however, her statements are still protected by the privilege because they are consistent with her "primary purpose" to "further the interest which is entitled to protection."  *Mattiaccio*, 87 F. Supp. 3d at 185; *see also, e.g.*, *Alade*, 28 F. Supp. 2d at 656–57 (finding that the defendants' statements made in "performing in good faith what they reasonably perceived to be their duty to enforce their employer's sexual harassment policy" were protected by the common-interest privilege, and finding no malice).

Because the statements, on their own terms, are not malicious, Thomas must point to extrinsic evidence showing Moreland's malice.  *Novecon*, 190 F.3d at 567.  But the evidence before the Court further corroborates Moreland's position that she acted out of genuine discomfort—not malice, bad faith, evil motive, or ill will.

Before addressing Thomas's theories for malice, the Court first reviews the evidence that corroborates Moreland claim that in making her statements to Norbert, she was motivated by genuine discomfort with Thomas and his conduct.  Particularly revealing are contemporaneous texts to her friends.  For instance, long before her meeting with Norbert in September 2017, Moreland texted a close friend in February 2017, saying: "Weirdo [Thomas] is here and not sure why.  I'd like him to think I've left."  ECF No. 198-25 at 2; ECF No. 209-3 ¶ 109.  A few months later, she

texted the same friend that she was "dreading going to the office" as she "worried Jeff [would] be there." ECF No. 198-26 at 3; ECF No. 209-3 ¶ 109. These contemporaneous communications signaling her discomfort with Thomas match the sentiments conveyed in Statements 1–12 and cut strongly against the notion that shew acted with malice.

Moreland's deposition testimony also supports the genuineness of her discomfort with Thomas and the lack of malice: "a conscious indifference or reckless disregard as to [her state-ments'] results or effects upon the rights or feelings of others as to constitute ill will." *Wood*, 316 F. Supp. 3d at 482. Rather, Moreland testified that she was careful to limit what she told Norbert and tried to cabin the effects of her statements. In her deposition, Moreland testified that, based only on her "personal perception," she observed certain "red flags" in her interactions with Thomas that "seemed very concerning *to* [*her*]." ECF No. 198-5 at 19 (emphasis added). When Norbert asked to speak with Moreland in September 2017, Moreland "was transparent" in relating them. *Id.* at 41. She expressed to Norbert her "concerns from [Thomas's] behavior that made [her] un-comfortable, including following [her] around the office[,] . . . very persistent questioning about [her], and probing questions about the organization." *Id.* at 44. But in expressing those concerns, Moreland testified that she took care *not* to "mak[e] assumptions" and to "[j]ust shar[e] [her] con-cerns and how it made [her] feel." *Id.* at 86. Moreland explained that she was navigating a "com-plicated dynamic in balancing how [she] felt personally and also following the orders of [her] manager [Pacelle] to make sure a major donor [Thomas] had a positive work experience." *Id.* To that end, Moreland testified that she made Norbert "aware that [she] was trying to be very sympa-thetic and understanding." *Id.* at 87. All of this suggests a lack of malice on her part.

What is more, others at HSUS familiar with the events surrounding Statements 1–12 largely echoed Moreland's contemporaneous communications and deposition testimony. For

instance, Herndon testified that HSUS had no "reason to believe" that Moreland did not make her "statements about his conduct in good faith." ECF No. 198-6 at 20 (emphasis added). Indeed, had HSUS believed otherwise, it "wouldn't have considered [the concerns]." *Id.* Other HSUS employees who knew Moreland likewise testified that jealousy or spurned romantic feelings did not animate Moreland sharing her concerns with Norbert.[19]

Against the considerable evidence that Moreland's statements to Norbert were motivated by her genuine discomfort with Thomas and his conduct, and were not malicious, Thomas offers only fanciful theories for why Moreland acted with malice. His theories and do not come close to creating a genuine issue of material fact on this point.

First, Thomas argues that Moreland's alleged romantic interest in Thomas—and her jealousy because Thomas allegedly spurned her advances—reflects malice. It is "obvious," in his view, that Moreland made romantic advances toward Thomas, as evidenced by "flirtatious text messages, and date invitations," and that Thomas "turn[ed] her down." ECF No. 203 at 11. But it is not obvious at all. In fact, the text messages themselves paint a different picture, one in which *Thomas* made repeated efforts to spend time with Moreland. On April 30, 2017, he texted Moreland "This time next Sunday would be a perfect time for a walk and talk with [your dog] if you're in town! The magic hour." ECF No. 198-19 at 7. Although Moreland first agreed to a walk, when Thomas texted to confirm, Moreland cancelled. *Id.* at 6. Later, on June 2, Thomas texted Moreland that it "[l]ooks like your things are still here [in the office]? Happy to give you and Dre a

---

[19] *See, e.g.*, ECF No. 198-15 ¶ 11; ECF No. 198-10 at 6; ECF No. 198-11 ¶ 20; ECF No. 198-12 ¶ 16; *see also* ECF No. 209-3 ¶ 116; ECF No. 198-38. Thomas brands these depositions and affidavits as "inadmissible" for containing "hearsay and unverifiable opinions." ECF No. 209-3 ¶ 116. But his "legal conclusions 'cloaked' as facts are not sufficient to create a genuine issue of material fact." *BCCI Holdings*, 977 F. Supp. at 6. And the Court may also rely on this evidence even if, as Thomas says, it contains a witness' lay opinion. *See* Fed. R. Civ. P. 56(c); Fed. R. Evid. 701

ride home." *Id.* at 3.  Moreland did not take him up on the offer.  *Id.*  Then, on June 18, Thomas

once again asked Moreland "How do you and Dre feel about going for a walk tomorrow?"  *Id.*  At

least via text, Moreland did not respond.  *See id.*  These communications suggest that it was

Thomas, not Moreland, whose invitations were rebuffed.

Thomas emphasizes that one time Moreland asked Thomas to a brunch, and Thomas says

he declined that invitation: "We agreed to go for a dog walk at 7:00 on a Sunday instead [of] going

to Sunday brunch because I didn't want to go to Sunday brunch with her"; "I only wanted a pla-

tonic friendship with her.  I did not want to date her."  ECF No. 198-9 at 29–30.  But, aside from

Thomas's own testimony, there is no record evidence that Moreland intended that brunch to be

romantic or that she felt rejected—romantically or otherwise—when Thomas declined.  *See E.M.*

*v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338, 407 (D.D.C. 2020) ("'[A] plaintiff's

own self-serving, conclusory statements' are not enough to create a genuine dispute of material

fact at summary judgment.") (citation omitted).  Indeed, Moreland, for her part, testified that she

asked Thomas to brunch because he was a donor and chose a brunch (rather than some other out-

ing) to avoid "one-on-one settings in more remote locations, which did not make [her] feel com-

fortable."  ECF No. 209-4 at 18.  Thomas's rejection of a single brunch invitation by Moreland

does not come close to suggesting that she acted with malice when she disclosed her concerns to

Norbert.[20]

---

[20] Quoting from his complaint alone, Thomas relatedly argues that Moreland was "moti-
vated by malice and bad faith" because she was "jealous" and "spiteful" of romantic relationships
he had with other HSUS employees.  *See, e.g.*, ECF No. 203 at 17 & n.23 (quoting Am. Compl.
¶ 74).  Yet, "it is well established that [he] cannot rely on the allegations of [his] own complaint
in response to a summary judgment motion, but must substantiate them with evidence."  *Grimes
v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015).

Next, Thomas argues that Moreland acted maliciously because she was trying to protect Pacelle. He asserts Moreland's "motive to report her 'concerns' that [Thomas] was a 'mole' . . . were motivated by [Thomas's] complaining about [Moreland] and the CEO's 'inappropriate relationship in the workplace' and the CEO's 'sexism.'" ECF No. 203 at 14. But Thomas fails to point to any evidence (even assuming he made such complaints) that any of that played a role in Moreland's response to Norbert's inquiry, or—more to the point—that Moreland was not motivated by genuine discomfort with Thomas and his conduct.

Finally, Thomas says, consistent with his other theories, that Moreland acted with malice because she was trying to get him fired. ECF No. 203 at 18. He offers only ipse dixit that "no reasonable person would believe [that her statements] are designed to do anything less than get the employee fired," and maintains that Moreland's contrary claim is so "frivolous" that it "need hardly be addressed." ECF No. 203 at 18. But it is *Thomas*, not Moreland, who "must make '[a] substantial proffer' of evidence of malice in order 'to meet [his] demanding" burden to prove malice to defeat Moreland's common-interest privilege. *Armenian Assembly*, 692 F. Supp. 2d at 49. He provides none. *See, e.g.*, *Dickens v. Whole Foods Mkt. Grp., Inc.*, No. 01-cv-1054 (RMC), 2003 WL 21486821, at *3 (D.D.C. Mar. 18, 2003) ("While he argues the right legal standard, [the plaintiff] provides no factual support for his argument that [the defendant] acted with malice."). Under the circumstances here, even if Thomas could prove that Moreland thought or hoped that HSUS would fire Thomas because of what she reported—that is, that she was "inspired in part by resentment or indignation"—her statements would still be protected under the common-interest privilege. *See Alfred*, 374 A.2d at 290–91.

*    *    *

Moreland has met her burden to show that the common-interest privilege applies to Statements 1–12.  Thomas, on the other hand, has failed to defeat that privilege, either by showing excessive publication or malice.  The common-interest privilege is thus an absolute defense to Thomas's defamation claims based on those statements, and Moreland is entitled to summary judgment.

## III.    Conclusion

For all these reasons, the Court will deny Plaintiff's motion for relief under Rule 56(d), grant Defendant's summary-judgment motion, and enter judgment for Defendant.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: November 6, 2023